**EL POMAR INVESTMENT COMPANY,**
Plaintiff,

v.

**The UNITED STATES of America,**
Defendant.

Civ. No. 6503.

United States District Court
D. Colorado.
Nov. 15, 1962.

Ben S. Wendelken, of Murray, Baker & Wendelken, Colorado Springs, Colo., for plaintiff.

Lawrence M. Henry, U. S. Atty., Denver, Colo., Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Jerome Fink and Dale E. Anderson, Attys., Dept. of Justice, Washington, D. C., for defendant.

KERR, District Judge (assigned).

This is an action to recover $2,832.13 allegedly overpaid income tax for the calendar year 1951. Plaintiff's claim is premised on the theory that part of the distribution received by it as a shareholder constitutes a return of capital rather than income. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1346(a) (1).

It is the taxpayer's position (1) that the earnings and profits of The Garden City Company should be offset by the operating deficits which it acquired from its predecessor corporations, and (2) that a cost depletion of $3,012.62 is a proper deduction in computing current earnings and profits. The Government takes the contrary position. Pursuant to their

agreement at the pretrial conference the parties submitted this case on documentary evidence and a stipulation of facts.

Taxpayer, an investment and holding company, is a corporation organized under the laws of Colorado and has its principal place of business in Colorado. It held stock in The Garden City Company, a Colorado corporation, from which company it received a distribution in 1951. This distribution in the amount of $67,539.00 was included as a dividend income in taxpayer's income tax return for the fiscal year ending December 31, 1951, and the tax due thereon was paid. Taxpayer thereafter filed a timely claim for refund of $2,832.13, asserting that 45.72967% of the $67,539.00 distribution was taxable as dividends from earnings and profits. There is dispute over this amount. The government, however, does controvert the taxpayer's claim that the balance of the distribution, that is, $36,653.64, or 54.27033% of the aforesaid distribution was a return of capital and as such was not taxable.

On August 7, 1957, the District Director mailed the statutory notice of disallowance of taxpayer's claim on the ground that the distribution of The Garden City Company was fully taxable. In disallowing the claim the government refused (1) to reduce the net income of The Garden City Company for its fiscal year ending February 29, 1952, by the amount of $3,012.62, representing cost depletion; and (2) to take into consideration the deficit of The Garden City Company's predecessor corporation to which the present The Garden City Company succeeded by means of an approved tax free reorganization. The basis of taxpayer's claim and of the government's disallowance takes the present controversy out of the scope of the reasoning in United States of America v. Kavanagh, 8 Cir., 308 F.2d 824.

A brief outline of the corporate history of the corporation which made the distribution is necessary to resolve the problems confronting the parties. The present corporation, of which taxpayer is a shareholder, is The Garden City Company, a Colorado corporation. It is the corporation which has survived two reorganizations. The Garden City Sugar and Land Company was reorganized in 1920 into the Garden City Company, a Delaware corporation. In 1930 the Garden City Company was reorganized and on November 17, 1930, all the property of the Garden City Company was transferred to The Garden City Company, a Colorado corporation.

Each predecessor corporation was in financial difficulties. In 1919 and again in 1929 a bondholders' committee was organized to represent the interests of the creditors of the unsuccessful corporation. Cessation of its corporate life by foreclosure, sale of the pledged properties, and application of the proceeds to the mortgage indebtedness was rejected by the bondholders' committees. They chose, rather, to preserve the assets of the old company, continue its business operations and save it from complete collapse which was threatened by its inability to meet the burden of paying the defaulted interest due on its bond obligations. Their goal was to readjust the financial structure of the debilitated corporations. In 1919 and in 1929 reorganization plans were promoted and executed. Each plan contemplated the exchange of bonds and stock of the new corporation for the bonds of the old corporation. There was a decree of foreclosure of the old corporation and a sheriff's sale of the property of the old corporation, the foreclosure proceedings having been conducted under state law. After the bondholders' committee purchased the property of the old corporation it formed a new corporation to which it transferred all the property of the old corporation in exchange for the stock of the new company, the bondholders thereby becoming the stockholders of the new corporation. At the time of its organization neither new corporation had any deficits or earnings except such accumulated earnings or deficits as might have been properly carried over from the old company. The new corporation carried on the same business, at the same place, and with the same

property as did its predecessor corporation.

Concerning the deficits, it was stipulated that from January 1, 1914, to January 1, 1920, the Garden City Sugar and Land Company had an operating deficit of $1,214,384.97; and that from January 1, 1920, to November 17, 1930, the total operating deficit of the Garden City Company, a Delaware corporation, was $2,931,197.02, including $2,540,668.28 unpaid accrued interest on bonds at November 17, 1930.

█ The government argued that the unpaid interest should not be included in the deficit because the Income Mortgage Bond imposed no legal obligation upon the company to pay interest when the operations of the business resulted in a net deficit. Moreover, the government argues there was no provision in the bonds for the accumulation of interest. The government's contention in this respect cannot be sustained. The company was burdened with its interest obligations under the following provisions of the bonds:

"* * * Prior to January 1, 1930, interest on the principal amount shall be payable on the first day of January of each year, beginning January 1, 1921, but only to the extent that the net income of the Company for the preceding year or years shall suffice therefor, and then only if, as and when the Board of Directors shall appropriate funds therefor, *but interest shall be cumulative, and on the first day of January, 1930, the Company will, in any event (and without the need for any appropriation and without regard to whether sufficient net income has at any time been earned), pay the principal hereof and all unpaid cumulative interest accrued at the rate of six (6) per cent, per annum.* * *"
(Emphasis added.)

Patently, therefore, the net operating deficit on November 17, 1930, must be $2,931,197.02 as set out in the stipulation.

For the fiscal year ending February 29, 1952, The Garden City Company, a Colorado corporation, had the sum of $56,843.47, which represented earnings and profits available for distribution without deducting $3,012.62 for cost depletion. In addition, it had $348,222.54, accumulated undistributed earnings after payment of dividends in previous years not deducting cost depletion, and not taking into account the operating deficits of the predecessor companies. For its fiscal year ending February 29, 1952, The Garden City Company paid its stockholders distributions in four equal installments totaling $117,477.00, which sum includes the $67,539.00 paid to taxpayer.

In its Answer filed herein the government admitted that the 1930 reorganization was a tax free reorganization. In its brief, however, it treated the 1919 and 1930 reorganization alike and interjected the postulate that both the 1919 and 1930 foreclosures were in the nature of bankruptcy proceedings. It thereupon deduced that the effect of the reorganizations was to eliminate all corporate deficits and to discharge the creditors and stockholders. According to this theory a new corporate entity emerged with no earnings and profits and with no deficits in earnings and profits.

The government's position is untenable and unsupported by the evidence. The frequent references to the tax free reorganization made by counsel for taxpayer in the pretrial conference were not challenged by the government. This issue was not raised in the government's pretrial statement of the contested issues of law and of fact, nor at the pretrial conference, nor in the stipulation and exhibits.

Both the 1919 and the 1930 transactions contain the characteristics of tax free reorganizations. On each occasion the going concern was in financial difficulties and unable to pay the interest accruing on its bonds. A bondholders' committee was organized to formulate a reorganization plan which would prevent the destruction of the business enterprise, conserve the assets of the corporation and continue its business. The bondholders had complete control of the old com-

pany when the plan of reorganization was proposed and adopted. Pursuant to each plan of reorganization a new corporation was formed to which all the property of the old company was transferred. The bondholders retained their control and pecuniary interest in the new company. Instead of discharging the claims of the creditors, they exchanged their interests for new stock and bonds, thereby extending the maturities of the bonds outstanding against the old corporation.

The stipulation and exhibits conclusively establish that both the 1919 and 1930 reorganizations qualify as tax free organizations. It matters not that the creditors of the old companies became shareholders of the new company. There was still a continuity of business, of ownership, and of control over the property, assets, and operation of the new company. Libson Shops Inc. v. Koehler, District Director of Internal Revenue, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957); Helvering, Commissioner of Internal Revenue, v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942); Palm Springs Holding Corporation v. Commissioner of Internal Revenue, 315 U.S. 185, 62 S.Ct. 544, 86 L. Ed. 785 (1942); Seiberling Rubber Co. v. Commissioner of Internal Revenue, 6 Cir., 169 F.2d 595 (1948).

Despite a change in the corporate form, the successor corporations were essentially the same corporations as their predecessors. The property, assets, debts, deficits and the business enterprise were acquired by the new companies. The reasoning in the case of Commissioner of Internal Revenue v. Sansome, 2 Cir., 60 F. 2d 931 (1932), cert. den. 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, recognized the unity of corporations in such a situation. That court concluded that the new corporation acquired the income and profits of its predecessor.

It would defy reason and justice to assert that the new companies assumed everything except the net operating losses. In the present case there was no element of tax avoidance, of artificiality, nor of non-conformance with the original business purpose and conduct. cf. Commissioner of Internal Revenue v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 (1949). The new companies were the same taxable entities as those which sustained the deficits. The eventual income and profits were derived from the same business which produced the deficits. It has been said that a deficit is a "red ink balance in operating income". United States v. Butte, A. & P. Ry. Co., 10 Cir., 38 F.2d 871, 872 (1930). A deficit is an integral phase of income and profits. The original corporations' earnings and profits, including the deficits therein, must remain earnings and profits and deficits of the successor corporation for purposes of distribution.

■ I cannot accept the government's unsupported assertion that the case of United States v. Snider et al., 1 Cir., 224 F.2d 165 (1955), is unsound. In that case it was held that the deficit in earnings and profits of the predecessor company must be taken into account in determining whether distributions made to the shareholders of the successor company are dividends. The government contends that the First Circuit is incorrect in the light of the Phipps case. The decision in Commissioner of Internal Revenue v. Phipps, supra, does not militate against the Snider case nor is it applicable to the facts before me. The material distinction in the Phipps case is the element of tax avoidance due to the fact that a preexisting corporation with pre-reorganization earnings and profits assumed the assets and liabilities of its five subsidiaries. In my opinion the facts in the Snider case are analogous to those in the case at bar, and the reasoning in the Snider case is persuasively logical and sound. Taxpayer should be allowed to utilize the deficit of the predecessor corporations in determining the taxability of cash distributions made by the successor corporation.

The last question to be resolved as stipulated is whether or not cost depletion is a proper deduction in determining profits available for distribution. The Court is not asked to determine the

method of computation nor the amount of the cost depletion allowable.

■ Of course, the basis of cost depletion does not include the cost or value of the land for purposes of other than mineral production. Whether or not the cost of the land included only its value for farming purposes or whether it included the value of its mineral resources are facts yet to be ascertained by the parties. Taxpayer contends that this essential fact may be determined at any time. The government assumed that there is no dispute "concerning the fact" that there was no known value of any mineral rights when the land was purchased. The government concludes that there can be no allocation of cost to such mineral values when discovered. The "fact" which the government assumes is not before this Court and the deduction therefrom cannot be decisive.

■ There is nothing in the stipulation or documentary evidence to prove, as the government argues, that the mineral rights had no value when the land was acquired. Neither is there any evidence that the value of the mineral rights was not known when the land was purchased. There is, however, some evidence inferring that the purchasers were aware of the inherent value of mineral interests. As early as 1918 one of the bondholders was solicited to invest in an oil company in the area. In 1929 the bondholders' committee used the mineral potentialities in the area to entice the bondholders to join the Bondholders' Protective Agreement.

Cost depletion is a proper deduction in determining profits available for distribution. The parties have agreed that the determination of the proper amount will be made by their engineers.

For reasons stated, I hold the continuity of interest test has been satisfied and the taxpayer is entitled to recover the amount of the tax erroneously paid to and collected by the government.

This opinion sufficiently states the findings of fact and conclusions of law of the

Court. Further findings of fact and conclusions of law are not necessary.

Counsel will submit judgment within twenty (20) days to the Court, to be entered and filed by the Clerk.