Richard H. DUNNING and Beulah Marie Dunning, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 13920-1.

United States District Court
W. D. Missouri, W. D.

Aug. 20, 1964.

Albert F. Hillix, Hillix, Hall, Hasburgh, Brown & Hoffhaus, Richard H. Brown, Kansas City, for plaintiffs.

F. Russell Millin, U. S. Atty., Clifford M. Spottsville, Asst. U. S. Atty., Kansas City, Mo., Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, Jerome Fink, Burton A. Schwalb, Dept. of Justice, Washington, D. C., for defendant.

JOHN W. OLIVER, District Judge.

This action for a refund of income taxes paid was instituted pursuant to Section 1346(a) (1) of Title 28 United States Code. Full cooperative utilization of pretrial procedures enabled the parties to stipulate all the relevant facts. We state and paraphrase particular facts from that stipulation in order to place the questions for decision and the contentions of the parties in perspective. We, of course, find all the facts as stipulated.

### STATEMENT OF FACTS

Missouri Public Service Company was incorporated as a Missouri corporation on November 29, 1926. On February 21, 1935, that corporation filed a petition under Section 77B of the Acts of Congress relating to Bankruptcy (C. 424, Section 1, 48 Stat. 912, as amended) in the United States District Court for the Northern District of Illinois.

A plan of reorganization was approved and confirmed by that Court on June 25, 1936. In the approved plan of reorganization, the existing corporate entity of the debtor corporation, Missouri Public Service Company, was not utilized; a new corporation, Missouri Public Service Corporation, a Delaware corporation, was incorporated November 20, 1936, to effectuate the various provisions of that plan of reorganization.

On November 30, 1936, prior to the issuance of new securities and the transfer of assets provided for in the plan, the new corporation, Missouri Public Service Corporation, entered its appearance in the reorganization proceedings and consented and submitted to the jurisdiction of the United States District Court for the Northern District of Illinois.

As of November 30, 1936, immediately prior to the effective date of the reorganization of debtor Missouri Public Service Company, a majority of its capital stock having power to vote for the election of directors was owned by Inland Power & Light Corporation, all of whose capital stock having power to vote for the election of directors was then owned by Commonwealth Light & Power Company; Commonwealth Light & Power Company was then a wholly owned subsidiary of Middle West Utilities Company.

The securities of and claims against the debtor Company which were dealt with and adjusted under the Plan consisted of the following:

| Designation | Number of Shares or Principal Amount Outstanding |
|---|---|
| Common Stock<br>No Par Value | 59,970 shares |
| $6 Cumulative Junior Preferred Stock<br>No Par Value | 1,286 shares |
| $7 Cumulative Preferred Stock<br>No Par Value | 18,677 shares |
| First Mortgage Twenty Year 5% Gold Bonds,<br>Series A, due February 1, 1947 | $6,351,000.00 |
| Notes Payable (unsecured) | 1,246,100.00 |
| Accounts Payable (Purchase of Property) | 102,214.69 |

———◆———

In addition to the foregoing, additional unsecured claims against the Company were dealt with to the extent and in the manner hereinafter indicated.

The $1,246,100.00 unsecured notes payable were demand notes, the principal amount of which had remained constant since October, 1932. Those notes payable were held by Middle West Utilities Company.

The plan of reorganization provided for a capitalization of new Missouri Public Service Corporation as of December 1, 1936, the effective date of the reorganization, as follows:

| Designation | Number of Shares or Principal Amount Outstanding |
|---|---|
| Common Stock<br>No Par Value | 133,705 |
| Warrants for Purchase of 13,000 shares<br>of Common Stock | 13,000 |
| First Mortgage Twenty-five Year 5% bonds,<br>Series A, dated August 1, 1935 due<br>August 1, 1960 | $4,445,700.00 |

Pursuant to the approved plan of reorganization, securities of the new Missouri Public Service Corporation were issued and other adjustments were made as follows (references to "old" bonds, preferred stock and common stock, are to securities of Missouri Public Service Company and references to "new" bonds and common stock are to securities of Missouri Public Service Corporation):

(a) $700 principal amount of new bonds, dated August 1, 1935, were issued in exchange for each $1,000 principal amount of old bonds. By the terms of the plan said new bonds were to bear interest at 5% per annum from the date thereof, payable semi-annually on the first days of February and August. The first maturing interest coupon attached to the new bonds was due August 1, 1937. With respect to each $700 principal amount of new bonds cash of $52.50 was paid, said payment being denominated by the corporation as interest from the date of the bonds to February 1, 1937.

(b) One share of new common stock was issued to bondholders for each $100 principal amount of old bonds. Bondholders received a total of 63,510 shares of new common stock, 47.5% of the total number of new shares issued.

(c) One and one-half shares of new common stock were issued in exchange for each share of old preferred stock, irrespective of class. Holders of old preferred stock received 29,944.5 shares of new common stock, 22.39% of the total number of new shares issued as follows:

| Old Securities Outstanding | | Common Stock Issued |
|---|---|---|
| $6 Cumulative Junior Preferred Stock No Par Value – 1,286 shares | | 1,929 shares ( 1.44%) |
| $7 Cumulative Preferred Stock No Par Value – 18,677 shares | | 28,015.5 shares (20.95%) |
| | Total | 29,944.5 shares (22.39%) |

(d) To the holder of the Notes Payable (unsecured) and Accounts Payable (purchase of property) and to the holders of certain other unsecured claims, were issued a total of 40,250.5 shares of new common stock, 30.11% of the total number of shares issued.

(e) The old common stock was exchanged for warrants, expiring December 31, 1939, entitling the holder (Inland Power & Light Corporation) to purchase an aggregate of 13,000 shares of new common stock at $25.00 per share.

In order to further identify the shifts of ownership caused by the execution of the plan of reorganization, it should be added that immediately prior to the effective date of the reorganization, December 1, 1936, all the common stock of the debtor Missouri Public Service Company was owned by Inland Power & Light Corporation but was pledged, as security for loans, to the Central Hanover Bank and Trust Company. The preferred stock of both classes and the first mortgage twenty-year 5% gold bonds Series A, due February 1, 1947, were held by the public.

As of December 1, 1936, the notes payable of the debtor corporation in the amount of $1,246,100.00 were payable to Inland Power & Light Corporation, but had been endorsed in blank without recourse by Inland and were then held by Daniel C. Green, Trustee for Middle West Utilities Company as security for the repayment of certain indebtedness due from The Commonwealth Light & Power Company to Middle West Utilities Company.

On November 30, 1936, the debtor Missouri Public Service Company transferred all of its property and assets to the new Missouri Public Service Corporation as provided in the approved plan of reorganization.

None of the stock purchase warrants were ever sold or exercised and all expired by their own terms in the hands of Inland Power & Light Corporation on December 31, 1939.

During the years 1958, 1959, and 1960 plaintiffs were the owners of shares of the common stock of the new Missouri Public Service Company, a Missouri corporation. To avoid confusion of names, it should be added that effective May 31, 1950, the state of incorporation of the new Missouri Public Service Corporation was changed from Delaware to Missouri, and the name of the corporation was changed to Missouri Public Service Company. The name of the debtor corporation and the name of the presently existing corporation is therefore the same.

During the years 1958, 1959, and 1960 plaintiffs received from the new Missouri Public Service Company cash distributions with respect to the shares owned by them in the respective total amounts of $511.20, $548.46 and $827.28.

Those amounts were reported by plaintiffs on their income tax returns for the years involved as taxable dividends and plaintiffs paid income tax thereon.

Thereafter, and within the statutory period of limitation within which claims for refund may be filed, plaintiffs filed a claim for refund with respect to each of the years involved. In each claim plaintiffs asserted that portions of the cash distributions were not taxable dividends but were distributions from sources other than earnings and profits and that with respect to each taxable year the amount from such sources was less than their adjusted basis for said stock.

There is no question but that as of November 30, 1936, Missouri Public Service Company had a deficit in earnings and profits at least in the amount of $1,465,627.91.

The parties expressly stipulated that "the major issue in this case is whether or not all or any part of this deficit should be carried over to Missouri Public Service Corporation of Delaware as of December 1, 1936, and then taken into consideration in computing subsequent accumulated earnings and profits available for dividends in subsequent years."

Consequently, the parties also have expressly stipulated that "if no part of the deficit of the debtor Missouri Public Service Company as of November 30, 1936, is to be carried over beyond that date and the earnings and profits as of December 1, 1936, are to be considered zero, then all the distributions through the years, including the three years involved in this action, constitute taxable dividends."

## CONCLUSIONS OF LAW

Plaintiffs' reply brief accurately summarizes the positions developed by the briefs of both parties. It is there stated: "The principal issue presented is whether or not a deficit in the earnings and profits account of [the debtor] Missouri Public Service Company as of November 30, 1936, immediately prior to the effective date of its bankruptcy reorganization, is to be carried over [to the new corporation] and recognized following the reorganization as an offset against earnings and profits realized subsequent to the reorganization. * * * Plaintiffs contend that the Company's reorganization was a tax-free reorganization under Section 112(g) (1) (E) and (F) of the 1939 Code, and, whether or not it was technically a tax-free reorganization, that the exchanges which occurred in 1936 were nontaxable exchanges under Section 112 (b) (5) of the Code. Defendant denies each of these contentions. Assuming the transactions to be nontaxable, the deficit carry-over is clearly required under the facts in the instant case because under that treatment of the deficit earnings and profits will be taxed as dividends to the same extent as they would have been so taxed had no reorganization occurred. Defendant's position is that no deficit

carry-over should be allowed, even if the 1936 transactions are to be treated as nontaxable.

"Even if these transactions are considered taxable it is plaintiffs' view that the deficit carry-over should be allowed and given effect beginning with the year 1943 in view of the legislative intent reflected in the remedial tax legislation which became effective for that year (The Revenue Act of 1943). Defendant contends that the legislative intent is inconsistent with that result.

"It is defendant's view that allowance of the deficit carry-over will permit a 'double deduction' for the same losses, and thus result in a windfall, while it is plaintiffs' view that no such windfall will be involved and in fact that the equities favor the deficit carry-over."

Plaintiffs have cited the provisions of the Revenue Act of 1939 throughout their briefs. The Government has cited the Revenue Act of 1936. We think the Revenue Act of 1936 is applicable because it became effective on June 22, 1936, (see Section 1003 of that Act). The citations to the different acts, however, are not of importance because the language of the particular clauses of Section 112 (G) (1) of both acts defines a "reorganization" as "a recapitalization," or "a mere change in identity, form, or place of organization, however effected." Plaintiffs do not contend that any of the other clauses are applicable. The same thing is true in regard to other sections of the Revenue Acts of 1936 and 1939 that are cited by the parties.

Plaintiffs argue that our controlling court's decision in United States v. Kavanagh, 8th Cir. 1962, 308 F.2d 824, was only "an approach * * * to the precise question presented by the instant case" (Plaintiffs' principal brief, page 75). The Government, on the other hand, argues that Kavanagh is controlling.

Plaintiffs contend that the result reached in Kavanagh is completely contrary to their interpretation of Commissioner v. Sansome, 2d Cir. 1932, 60 F.2d 931, Harter v. Helvering, 2d Cir. 1935, 79 F.2d 12, Commissioner v. Munter, 331 U.S. 210, 67 S.Ct. 1175, 91 L.Ed. 1441 (1947), Commissioner v. Phipps, 336 U.S. 410, 69 S.Ct. 616, 93 L.Ed. 771 (1949), and United States v. Snider, 1st Cir. 1955, 224 F.2d 165.

Plaintiffs rely most heavily upon El Pomar Investment Company v. United States, D.C.Colo., 1962, 210 F.Supp. 333, and its affirmance by the Court of Appeals of the Tenth Circuit, reported as United States v. El Pomar Investment Company, 10th Cir. 1964, 330 F.2d 872. Plaintiffs argue that those cases, when taken together with Snider, sustain their position.

The Government counters with the argument that the rationale of Snider was definitively limited by the Supreme Court's decision in Phipps, and that both decisions in El Pomar, if not distinguishable on the facts, are clearly wrong and should not be followed.

In brief, the Government contends that "the result in Kavanagh, not in El Pomar or Snider, is the proper one" and argues that the result of Kavanagh is consistent with the pertinent authorities, citing Helvering v. Southwest Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942); Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942); Palm Springs Holding Corp. v. Commissioner, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785 (1942); Bondholders Committee Marlborough Inv. Co., First Mortgage Bonds v. Commissioner, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784; and Helvering v. Cement Investors, Inc., 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649 (1942) as controlling.

Our study of the cases and what our controlling court had to say about them in Kavanagh convinces us that we must reach the same result in this case as the Court of Appeals reached in Kavanagh.

In one way or another, plaintiffs' arguments, in the final analysis, seek a judicial extension of what has became known as the Sansome rule in order to permit a carry-over of the deficit of a debtor corporation reorganized pursuant to Section 77B of the Bankruptcy Act to a new successor corporation organized pursuant to

the approved plan of reorganization. We do not believe the so-called Sansome rule should be so extended.

In Sansome Judge Learned Hand did not deal with the deficit carry-over question here presented. He dealt with the different question of whether the surplus in the earnings and profits of an old corporation should carry-over to a successor corporation. The factual situation with which he dealt involved merely a new corporate charter that differed only from the old "only in that the company could manufacture other products besides silk, to which the charter of the old company had been confined." Judge Hand pointed out that "[t]here was no other change in the 'financial structure,' as the phrase is" (l. c. 932 of 60 F.2d).

A cursory reading of Sansome reveals that Judge Hand was once again engaged in demolition of the product of black letter reasoning as it related to the facts of corporate life. He pointed out that whether particular corporate transactions should or should not be said to "break the continuity of the corporate life, [was] a troublesome question that the courts had beclouded by recourse to such vague alternatives as 'form' and 'substance', anodynes for the pains of reasoning" (l. c. 933 of 60 F.2d). It did not take him long to hold that merely because a "new and independent" corporation had been formed was not sufficient to support the Board's idea that the liquidating dividends of the new company had in fact been distributed out of its own capital and not out of the earnings and profits of the old corporation within the meaning of the applicable taxing statute.

The precise holding of Sansome was merely that "a corporate reorganization which results in no 'gain or loss' * * * does not toll the company's life as continued venture * * * and that what were 'earnings and profits' of the original, or subsidiary, company remain, for purposes of distribution, 'earnings and profits' of the successor, or parent, in liquidation" (l. c. 933 of 60 F.2d).

That holding, of course, was not concerned with whether a deficit would or would not carry-over to the successor corporation. Indeed, it is difficult to comprehend how a deficit in earnings and profits could be, as a matter of logic, fitted into the language of Sansome for the realistic economic reason that a deficit in earnings and profits simply cannot be used for purposes of distribution. A deficit, of course, has a relationship to the question of when and how a distribution may be made, but only dividends, not deficits, may be declared.

Commissioner v. Munter, supra, involved another surplus case in which a quite mechanical application of Sansome had been made. The Supreme Court unanimously agreed that Sansome simply "held that implicit in the tax exemption of reorganization distributions was the understanding that the earnings and profits so exempt were acquired by the new corporation and were taxable as income to stockholders when subsequently distributed" (l. c. 214–215 of 331 U.S., 1177 of 67 S.Ct.).

Commissioner v. Phipps, supra, involved the question of whether "the rule of Commissioner v. Sansome, 2 Cir., 60 F.2d 931, requires the subtraction of the subsidiaries' deficit from the parent's earnings and profits, in determining whether a subsequent distribution by the parent constitute[s] dividends or a return of capital to its stockholders" (l. c. 411 of 336 U.S., 617 of 69 S.Ct.). With express disapproval, the Supreme Court unanimously rejected cases that suggested that "[t]he rationale of the Sansome decision [rested on]. * * * a 'continued venture' doctrine" (l. c. 416 of 336 U.S., 619 of 69 S.Ct.) Phipps held that "the Sansome rule is grounded not on a theory of continuity of the corporate enterprise but on the necessity to prevent escape of earnings and profits from taxation" (l. c. 417 of 336 U.S., 620 of 69 S.Ct.).

The taxpayer in Phipps argued that logic somehow required that the carry-over treatment given a surplus in earnings and profits should also be given a

deficit in earnings and profits. The Supreme Court held that:

"Respondent's contention that the logic of the Sansome rule requires subtracting the deficit of the subsidiary from the earnings and profits of the parent as a corollary of carrying over the earnings and profits of the subsidiary has a superficial plausibility; but the plausibility disappears when it is noted that the taxpayer would thus obtain an advantage taxwise that would not be available absent the liquidation since there is no way to 'declare' a deficit, and thus no method of loss realization open to the parent parallel to a declaration of dividends as a mode of realizing the profits of a subsidiary." (l. c. 420 of 336 U.S., 621 of 69 S.Ct.)

United States v. Snider, supra, upon which the district court in El Pomar and plaintiffs in this case so strongly rely, is based upon an acceptance of the "logic" that the Supreme Court in Phipps described to be of but "superficial plausibility"—a plausibility that "disappears when it is noted that * * * there is no way to 'declare' a deficit" (l. c. 420 of 336 U.S., 621 of 69 S.Ct.).

Without attempting to state what reasoning it had in mind, the First Circuit in Snider suggested that "It would appear to follow from the reasoning used in the Sansome case that the plaintiffs are entitled to recover, for logic would seem to require that if the prior business organization's profits and losses must be attributed to the successor corporation following a tax-free reorganization, similarly the prior enterprise's deficits should be attributed to the successor corporation" (l. c. 167 of 224 F.2d).

In spite of the fact Snider purported to recognize that Phipps had held that "subtracting the deficit * * * is not a corollary to the carrying over * * * earnings and profits" (l. c. 167 of 224 F. 2d), it nevertheless proceeded to attempt to distinguish Phipps to the end of holding that "a logical application of the Sansome rule, even as that rule has been defined by the Supreme Court in the Phipps case, compels us to conclude that in determining whether distributions made to its stockholders by the [successor corporation] are dividends, the deficit of its * * * predecessor must be taken into account" (l. c. 168 of 224 F.2d).

While we believe Snider may well be distinguishable on the facts, we also believe that its sauce for surplus goose should be sauce for the deficit gander brand of logic is, in the language of Phipps, of but superficial plausibility.

We know of no logical reason why the existence of a judicial rule designed to prevent an escape of earnings and profits from taxation by a successor corporation requires the establishment of another judicial rule that would prevent taxation of earnings and profits of a corporation that would have otherwise been taxable except for the fact that such corporation had happened to have acquired its assets from a predecessor who had been the debtor in a 77B corporate reorganization.

In contrast to our reaction, it is clear that the district court in El Pomar found that "the reasoning in the Snider case is persuasively logical and sound" (l. c. 336 of 210 F.Supp.). It is also clear, however, that the Court of Appeals of the Tenth Circuit in El Pomar did not share the district court's high regard for Snider. Judge Orie Phillips, in fact, noted that "commentators and text writers have placed a broader construction on the opinion in Phipps than did the First Circuit in Snider" (l. c. 882 of 330 F.2d).

For an example El Pomar quoted Wales' commentary at the Eighth Annual N.Y.U. Institute on Federal Taxation, pp. 920–924, as follows: The "rule that deficits do not survive the extinction of the corporation in which they arose * * apparently has no exceptions" (l. c. 883 of 330 F.2d). The result of Snider, of course, was a direct violation of the rule that Wales believed to be without exception.

In like manner, Merten's Law of Federal Income Taxation, 1962 Ref. Vol. 1 §

9.52 p. 102, was quoted as follows: "[I]f the transferor or distributor had the deficit, that deficit would not wipe out earnings and profits of the acquiring corporation" (l. c. 883 of 330 F.2d). See also the authorities cited in footnote 11 on page 883 of 330 F.2d for other comment on Snider and Phipps to which Judge Phillips directed attention.

The Tenth Circuit in El Pomar held, consistent with what we have said, that "We think preventing tax avoidance by means of tax-free reorganizations was the touchstone of Sansome and Phipps" (l. c. 883 of 330 F.2d). The judgment of the district court was affirmed, not on the theory upon which it had relied, but upon the theory that, on the facts, the result of the case was correct.

We need not examine the validity of the factual distinction made by the Tenth Circuit of Kavanagh in El Pomar. We must follow and apply Kavanagh to the stipulated facts in this case.

One might argue that Kavanagh rested solely upon its definitive determination that plaintiff failed to sustain "the burden of proving that the distributions in question were not made from current earnings or profits in the years of distribution and that there were no other accumulated earnings or profits from which such distribution could be attributed" (l. c. 832 of 308 F.2d).

But our duty requires that we follow more than the most narrow ground of decision of our controlling court. The orderly administration of justice requires us to read its decisions broadly and to apply its full teaching to later cases. We can not assume that our Court of Appeals writes merely for intellectual exercise. Kavanagh must therefore be read in light of how it accepted or rejected the rationale of the district court it reversed.

The district court's opinion in Kavanagh 187 F.Supp. 430, quoted at its outset the plaintiff's reliance upon Sansome and Snider. Generally speaking, it accepted the First Circuit's narrow interpretation of Phipps. Specifically, relying upon Snider, the district court held that

"in determining whether the distributions made to its stockholders by the [successor corporation] are dividends, the deficit of its predecessor corporations must be taken into account" (l. c. 433 of 187 F.Supp.).

The Government's appeal, of course, set the stage for acceptance or rejection of the rationale of the district court's opinion. Before ruling on the burden of proof point, the Court of Appeals in Kavanagh determined that "neither the rule in Commissioner of Internal Revenue v. Sansome, 60 F.2d 931 (2 Cir. 1932) cert. den. Sansome v. Burnet, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575, nor the reasoning of the Court in United States v. Snider, 224 F.2d 165 (1 Cir. 1955) relied on by the District Court are applicable to the stipulated facts and documentary evidence here" (l. c. 831 of 308 F.2d). A comparison to Humpage v. C. I. R., 17 T.C. 1625, was then directed.

The Court of Appeals in Kavanagh evidenced its acceptance of the rationale of Phipps and of Humpage when it stated that:

"No 'deficit carryover' could possibly have followed from the old to the new reorganized company from the standpoint of accounting, nor legally, as a consequence of the 77B proceedings.

"The only inference to be made from the stipulated facts and documentary evidence in the case at bar is that Bell-Sorensen started out with a new financial slate." (l. c. 831 of 308 F.2d).

It would seem to be clear that the Court of Appeals' opinion in Kavanagh accepts fully the implication of Phipps that neither "logic" nor Sansome requires that an earnings and profits deficit be carried over in the same manner as an earnings and profit surplus.

Plaintiffs concede that "the old common stock [of the debtor corporation] as such was obviously wiped out" (plaintiffs' principal brief, page 56). If continuity is either a factual or a legal consideration, we find that such continuity, as it

was defined in the earlier cases, can not be said to exist under the stipulated facts of this case.

The earlier continuity cases to which we make reference are best illustrated by the four decided by the Supreme Court on February 2, 1942. Those cases, Limestone Co., Palm Springs Corp., Bondholders Committee, and Southwest Corp., reflect the quite fundamental change in regard to "reorganizations" introduced in federal tax law by the Revenue Act of 1934.

Limestone, for example, applied § 112 (i) (1) of the Revenue Act of 1928. That statute provided that "[t]he term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of * * * substantially all the properties of another corporation * * *". Applying that statute, Limestone held that "Insolvency reorganizations are within the family of financial readjustments embraced in [the words "merger" and "consolidation" as] those terms as used in this particular statute" (l. c. 184 of 315 U.S., 544 of 62 S.Ct.). Palm Springs and Bondholders represent factual variations of applications of that same broad statutory language.

Southwest Corp., however, involved the new Section 112(g) (1) of the Revenue Act of 1934 which first introduced the same statutory language involved in this case. That case pointed out that "[u]nder the statute involved in Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, * * there would have been a 'reorganization' here" (l. c. 198 of 315 U.S., 550 of 62 S.Ct.). That case further held that clause (B) and the other clauses of the new statute (Section 112(g) (1) of the Revenue Act of 1934) had made important changes in the law defining a "reorganization" and that cases construing the definitions contained in earlier statutes were not applicable to the more narrow statutory definitions provided in the new law.

Of specific impact on the case at bar was the construction placed by Southwest Corp. on clause (D), defining a "reorganization" as "a recapitalization," and on clause (E), defining a "reorganization" as "a mere change in identity, form, or place of organization, however effected."

Southwest Corp. held that clause (D) was not applicable to a transaction in which an equity court approved a plan of reorganization that included the organization of a new corporation that would acquire the assets of the old, and in which the rights of the security holders of the old corporation would be drastically altered. Under the plan of reorganization there involved, the common stockholders of the old corporation would be wiped out except for stock purchase warrants and the common stock of the new corporation would be issued to former bondholders and unsecured creditors of the old company. The Supreme Court held that such a transaction "was not that reshuffling of a capital structure, within the framework of an existing corporation, contemplated by the term 'recapitalization' " (l. c. 202 of 315 U.S., 552 of 62 S.Ct.).

The definition set forth in clause (E) was likewise held by Southwest Corp. to be inapplicable because "a transaction which shifts the ownership of the proprietary interest in a corporation is hardly 'a mere change in identity, form, or place of organization' within the meaning of clause (E)" (l. c. 202–203 of 315 U.S., 552 of 62 S.Ct.).

Plaintiffs suggest, however, that if a corporation "without altering its capital structure," merely changes its state of incorporation, the transaction would clearly fall within the definition of a clause (E) reorganization (we use the clause letters of the Revenue Act of 1936, rather than plaintiffs' citation of Clause (F) of the 1939 Code). Plaintiffs then suggest that if "no change in corporate domiciles had been involved" in the reorganization and that if the changes in capital structure could be considered a "recapitalization" under the cases, then there would have been a "reorganization" within the definition of clause (D) of Section 112(g) (1).

Plaintiffs then argue that "if the recapitalization and the change of corpo-

rate domicile had taken place at different times, and in separate and unrelated transactions, the two statutory provisions would have been applicable in the sequence in which the transaction occurred" (page 29 of plaintiffs' principal brief).

Plaintiffs seek separate, in point of time, applications of clauses (D) and (E). They seek to separate particular details of the mechanical procedure taken in the consummation of the full transaction because they concede that it would be impossible to contend that "the [debtor] company's reorganization considered as a unitary transaction was a 'mere change' of form, identity, or domicile" (page 41 of plaintiffs' principal brief).

Plaintiffs therefore argue that the execution of the 77B reorganization plan and the 77B proceeding itself should not be considered as a unitary transaction. Plaintiffs would have us determine that "what actually occurred in the instant case can be closely equated to a change of domicile followed within a short time by a recapitalization" (pages 29–30 of plaintiffs' principal brief).

We do not believe that plaintiffs' argument can be sustained because the broad thrust of the Supreme Court's teaching in the reorganization cases just discussed is to the effect that "[t]he legal procedure employed by the creditors is not material" (Palm Springs Holding Corp., l. c. 188 of 315 U.S., 546 of 62 S.Ct.), and to the effect that "the precise mechanics whereby the reorganization was consummated are not material" (Bondholders Committee, l. c. 191 of 315 U.S., 539 of 62 S.Ct.). Compare also the rationale of Limestone where arguments as to what had taken place "technically" were rejected in favor of a judicial view that "conforms to realities" (l. c. 183 and 184 of 315 U.S., 62 S.Ct. 540).

Plaintiffs' argument simply does not conform to the legal and factual realities that exist in 77B reorganization proceedings in general and those that were stipulated to have existed in the particular 77B reorganization proceeding involved in this case. The old debtor corporation found itself in a position where it was insolvent in the sense of being unable to meet its obligations as they matured.

The organization of a new Delaware corporation was not, in fact, a "mere change of form, identity, or place of organization" of the debtor corporation; the utilization of that legal step was an integral and necessary part of the overall legal procedure that would eventually establish, outside the framework of the existing debtor corporation, new rights and interests of persons who had been stockholders and creditors of the debtor corporation, a corporation that, under the judicially approved plan, was destined for extinction.

The factual realities require recognition of the fact that the entire 77B proceeding was designed, as Kavanagh quite tersely suggests, to start a new corporation out "with a new financial slate." The earned surplus account on the balance sheet of the new corporation, as of December 1, 1936, per the company books was recorded as zero. So far as book entries were concerned in 1936, it is clear that no one thought in 1936 that any deficit carry-over was supposed to have "followed from the old [debtor corporation] to the new reorganized company from the standpoint of accounting, nor legally, as a consequence of the 77B proceeding," to again borrow the language of Kavanagh (l. c. 831 of 308 F.2d). For a similar pragmatic approach to a different tax problem involving a 77B proceeding as that taken by Kavanagh, see Willingham v. United States, 5th Cir. 1961, 289 F.2d 283, 286–287).

And, all questions of estoppel to one side, the stipulated facts further establish that in correspondence between the new corporation and the Deputy Commissioner of Internal Revenue in 1937 and 1938, the new corporation was advised that the 77B reorganization was not a reorganization within the meaning of Section 112(g) (1). That ruling was accepted for many tax purposes, not important to discuss here, but we think it important to point out that the tax returns of the new corporation were filed

on the premise that the 77B reorganization was not a tax-free reorganization.

We believe the facts stated are important as data which recognized and therefore supports our appraisal of the realities of the 77B reorganization. We, of course, find that plaintiffs' argument that the letter ruling was erroneous is not tenable for all the reasons we state in this memorandum opinion.

■ We turn now to plaintiffs' contention that even if it is determined that its position in regard to Section 112(g) (1) is not sustained, we must nevertheless determine that under Section 112(b) (5) the debtor corporation's 77B reorganization was not a taxable transaction. Helvering v. Cement Investors, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649 (1942) is relied upon.

That case, of course, does hold that "the fact that [a particular transaction] cannot meet the statutory standards of a 'reorganization' [as defined in the various clauses of Section 112(g) (1)] does not necessarily mean that it cannot qualify as an 'exchange' [as defined in Section 112(b) (5)], any more than the failure to satisfy one clause of the 'reorganization' provisions [of Section 112(g) (1)] means that none can be satisfied" (l. c. 534 of 316 U.S., 1128 of 62 S.Ct.).

But that case does not hold that because a particular transaction may factually qualify as an "exchange" within the meaning of Section 112(b) (5) that it necessarily follows that all transactions approved pursuant to 77B plan of reorganization must be said to qualify as an "exchange" under Section 112(b) (5). Each case must turn on its own facts.

The controlling facts in Cement Investors required an application of the doctrine of Limestone by virtue of which the Supreme Court, in order to conform to realities, considered that the ownership of the entire equity interest in the old corporation had passed to its creditors at least by the time the 77B proceedings were instituted.

The "exchange" under consideration in Cement Investors, was therefore, by operation of law, considered to be an exchange made by the creditors of the old corporation of their then presently existing equitable claim in or to the property that had been owned by the debtor corporation.

Under the facts there involved, the interests of the old stockholders had been excluded by operation of law long before any plan of reorganization had been submitted or approved by the reorganization court. Under the facts stipulated in this case, plaintiffs concede that the debtor corporation's financial condition was such that "the bondholders and other creditors were * * * not entitled to completely exclude the prior equity interests" (page 56 of plaintiffs' principal brief).

It is therefore apparent that the factual situation stipulated here and that presented in Cement Investors is quite different. We therefore cannot say in this case, as the court was required to say in Cement Investors, that "property" was transferred in "exchange for stock or securities" and that those who exchanged the "property" were thereafter "in control of the corporation," as required by Section 112(b) (5).

Our analysis of the stipulated facts also requires the additional finding and conclusion that any realistic appraisal of any exchange that could be said to have been made does not establish the requisite 80 per centum of the total voting power in any transferor of property within the definition of Section 112(b) (5). For all the reasons stated we hold that Section 112(b) (5) is not applicable.

Plaintiffs also contend that the Section 112(b) (10), enacted in 1943, is applicable. Plaintiffs concede, however, that the 1943 Amendment was intended to operate retroactively only in the sense that it could be applied to any bankruptcy reorganization that occurred after December 31, 1933, and that the new provisions "were intended as prospective beginning with the year 1943 in the sense that the

tax treatment of a reorganization which had in fact been adopted by the corporation and its security holders during prior years was to be left undisturbed as to those years" (page 50 of plaintiffs' principal brief).

The reorganization here involved was, of course, treated as a taxable transaction. The short, but we believe complete, answer to plaintiffs' Section 112(b) (10) argument is that the Congress indicated no intention to act retroactively to the end that a 1936 taxable transaction should be converted into and considered at a later date as a tax-free reorganization for deficit earnings and profits purposes. We so hold.

Plaintiffs contend finally that "the equities favor the deficit carry-over" (page 2 of plaintiffs' reply brief). The Government, of course, argues to the contrary. We note in passing that Kratz, in his article "Loss Carryovers in Chapter X Reorganizations," 16 Tax Law Review 359, 407, suggests that "it may be questioned whether * * * the debtor's deficit in earnings and profits * * be carried over to the acquiring corporation * * * is a desirable result."

His comment on page 409, however, that "relief must come from Congress" defines the permissible scope of our inquiry into the matter of equities. We must presume that the Congress weighed the equities when it wrote the statutes before us.

It is our limited function and duty to construe and apply the statutes before us in light of the rules of decision of our controlling courts. In the discharge of that duty and for the reasons stated, we conclude the issues in favor of the defendant.

The Government shall, within fifteen (15) days, present a form of final judgment consistent with the stipulation of the parties and this memorandum opinion. The proposed form of final judgment shall be submitted to counsel for the plaintiffs for approval as to form.

It is so ordered.