**BETA SYSTEMS, DIV. OF VELCON FILTERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 738–85C, 77–88C.**

United States Claims Court.

Jan. 19, 1989.

---

William H. Gammon, Vienna, Va., for plaintiff.

Agnes M. Brown, Washington, D.C., with whom were Asst. Atty. Gen. John R. Bolton, Director David M. Cohen, and Asst. Director Thomas W. Petersen, for defendant.

## MEMORANDUM OPINION

LYDON, Senior Judge:

■ Plaintiff, a government contractor, has moved for partial summary judgment on Count I of its complaint in docket No. 77–88C. Defendant opposes said motion and cross-moves for partial summary judgment.[1] The question in this case is basically one of contract interpretation and construction. Lurking in the shadows, however, as a result of the Federal Circuit's opinion, *supra*, is the matter of intent relative to the interpretation question. While the parties differ significantly on the intent question, as reflected by their conflicting affidavit and declaration, both seek summary judgment on the ground that there are no issues of material fact and each claims

---

1. It is important to bear in mind the fact that this litigation embraces two consolidated cases. Both cases arise out of the same multi-year procurement. The Federal Circuit, reversing this court's unpublished Memorandum Opinion of October 9, 1986, directed that summary judgment on Count I in docket No. 738–85C, involving the First Program Year of the multi-year procurement be entered in favor of plaintiff. *Beta Systems, Inc. v. United States,* 838 F.2d 1179 (Fed.Cir.1988). On March 4, 1988, this court, in compliance with the Federal Circuit's opinion, issued an order vacating its Memorandum Opinion of October 9, 1986 and the attendant judgment dated October 16, 1986. This court dismissed Count II in docket No. 738–85C in its Memorandum Opinion of October 9, 1986 without prejudice. This portion of the Memorandum Opinion, which dealt with the second, third and fourth years of the multi-year procurement, was not appealed to the Federal Circuit. *Id.* 838 F.2d at 1183–84. In Count I of docket No. 77–88C, plaintiff set forth claims for the second and third years of the multi-year procurement, which claims were similar to the claim advanced by plaintiff under Count II in docket No. 738–85C discussed above. Plaintiff's present motion for partial summary judgment is directed at Count I in docket No. 77–88C.

entitlement to judgment as a matter of law. Generally, the interpretation of a contract provision presents a legal question for the court to decide. However, where the provision in question is uncertain or ambiguous and parole evidence is advanced as an aid in interpretation of said provision, then the matter, a question of interpretation and conduct, becomes a question of fact, not a question of law, and summary judgment may accordingly be inappropriate. *See Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988). The parties seek to obviate the intent question in their briefs by approaching the interpretation question by recourse to the language of the contract itself. To the extent that the intent question surfaces, both parties rely on the affidavit or declaration they proffer in support of their respective motions. At oral argument both parties indicated that trial on the intent question, under the circumstances of this case, would not be productive principally because the intent each advocated was subjective intent.

### Preliminary Statement

Count I in docket No. 77–88C contains claims involving the second and third year of a multi-year procurement. Count II in docket No. 738–85C is Count I in docket No. 77–88C. Count II in docket No. 738–85C was the subject of discussion in *Beta Systems, Inc. v. United States, supra,* 838 F.2d at 1183–84, and, albeit dictum since Count II was not on appeal to the Federal Circuit, casts a large shadow on consideration of Count I in docket No. 77–88C now before the court on summary judgment motions filed by the parties.

The contract in question contained an Economic Price Adjustment (EPA) provision (section H–8) whereby seventy-percent of the contract price was subject to adjustment, upward or downward, for unanticipated economic fluctuation. The remaining thirty-percent of the contract price was not subject to the EPA provision (section H–8(a)). However, section H–8(p) of the EPA provision exempted from adjustment that portion of the contract price attributed to labor effort or acquisition of specific materials or components authorized by the contracting officer prior to First Article Approval. First Article Approval was granted on September 7, 1983 (838 F.2d at 1183). Plaintiff contends that the approval it received from the contracting officer on November 26, 1982 and March 19, 1983, covered all materials and substantially all labor for all four program years and options. Defendant, on the other hand, argues that the November 26, 1982 and March 19, 1983 approvals only covered the First Program Year and Option. This is so, defendant continues, because no funds had been authorized for the Second, Third and Fourth Program Years and Options when the contracting officer wrote the November 26, 1982 letter and the March 19, 1983 telex. The dispute thus centers on the construction and interpretation of section H–8(p) of the EPA provision and what role, if any, the intent of the parties should play in construing and/or interpreting section H–8(p).

### FACTS

On September 29, 1982, the U.S. Army Troop Support and Aviation Material Readiness Command (AMRC) awarded Contract No. DAAJ09–82–D223 to Beta for supply of some 3544 liquid dispensing tank and pump units. Over the course of the contract some 4692 units were supplied. The contract was a 100% small business set-aside negotiated procurement. The contract was in the form of a multi-year procurement and required delivery over a period of in excess of four years. The multi-year procurement was broken down into "Program" years. The First Program Year (Fiscal Year 1982) was identified as "Contract Line Item Number (CLIN) 0001AA", the First Program Year Option was identified as "CLIN 0003"; The Second Program Year (Fiscal Year 1983) was identified as "CLIN 0004AA", the Second Program Year Option was identified as "CLIN 0005"; the Third Program Year (Fiscal Year 1984) was identified as "CLIN 0006AA", the Third Program Year Option was identified as "0007"; the Fourth Program Year (Fiscal Year 1985) was identified as "CLIN 0008AA", the Fourth Pro-

gram Year Option was identified as "CLIN 0009".

The First Program Year called for the purchase of 1000 tank and pump units, broken down by CLINs as follows: 998 units (CLIN No. 0001AA);·one unit (CLIN No. 0001AB), and one unit (CLIN No. 0001AC); the Second Program Year called for 780 units; the Third Program Year called for 763 units; and the Fourth Program Year called for 1001 units; for a total multi-year procurement program of 3544 units. Under the September 29, 1982 contract, as awarded plaintiff, plaintiff was to supply 1000 units at a unit price of $6,497.00 for the First Program Year. The total First Year Program contract amount was $6,798,000.

In its bid submission, plaintiff proposed a unit price of $6,892.00 for 780 units for the Second Program Year resulting in a total contract price for the Second Program Year of $5,375,760, for the Third Program Year, plaintiff's bid price of $7,463.00 per unit produced a total contract price for that Program Year of $5,694,369 covering 763 units; and for the Fourth Program Year, plaintiff's bid price of $7,910.00 per unit produced a total contract price of 7,917,910 covering 1001 units. Bid prices were also submitted by plaintiff relative to the option quantities set forth in the contract documents for each of the Program Year Options. Plaintiff's bid prices per unit for the Program Year Options were $6,400.00 (First Program Year); $6,866.00 (Second Program Year); $7,400.00 (Third Program Year); and $7,898.00 (Fourth Program Year). Contract award was based on all the above unit bid prices. The above unit prices were subsequently changed by contract modifications which served to increase the total contract price for each Program Year. Funding was always certified as available before any modifications were issued relative to purchase of contract units for any Program Year or Program Year Option.

At the time the September 29, 1982 contract was awarded, funding was certified available to the Army for procurement under the First Program Year. Funding was certified available for the First Program Year Option at various times during the period November 19, 1982—February 16, 1983 relative to the purchase of twenty-eight additional units under contract modification No. P 00002 dated May 11, 1983. Only five of these units were certified available (funded) for purchase prior to November 26, 1982. Those five units were funded on November 19, 1982. Funding was certified available for the First Program Year Option on May 18, 1983, relative to the purchase of 220 additional units under contract modification No. P 00003 dated May 31, 1983. Plaintiff was authorized to undertake performance of the Second Program Year of the contract by modification No. P 00001 which was issued on April 29, 1983. Funding was certified as available for this modification on April 25, 1983. Defendant maintains that the contracting officer for the September 29, 1982 multi-year procurement was not authorized to procure materials or authorize commencement of production for any program year and option in advance of an appropriation (funding) or an apportionment of an appropriation. Any action by the contracting officer to purchase materials prior to the certified availability of funds would violate, defendant contends, the so-called Anti–Deficiency Act, 31 U.S.C. § 1517 (1982). *See also* 31 U.S.C. §§ 1518 and 1519 (1982). This contention is the center piece for defendant's opposition to plaintiff's motion for partial summary judgment.

The contract in issue directed attention in Section H–7 to the multi-year features of the contract. Section H–7(1) specifically reserved to the Army its right to "Cancellation of Items," *citing* Armed Services Procurement Regulation (ASPR), DAR 7–104.-47(a)(b). Under this ASPR, dealing specifically with "Multi–Year Procurement," it is stated that "the amount of funds so described [in the contract] at the time of award is not considered sufficient for the contract performance required by and described in the Schedule for any Program Year other than the First Program Year. Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next

succeeding Program Year, the Contracting Officer shall, not later than the date specified in the [contract] Schedule * * * so notify the Contractor in writing * * *." DAR 7–104.47(b). The ASPR also provided that, "[t]he Government is not obligated to the contractor for contract performance in any monetary amount in excess of that described in the [contract] Schedule or modifications thereto, as available for contract performance." DAR 7–104.47(c). Finally, the ASPR provided that, "[t]he Contractor is not obligated to incur costs for the performance required for any Program Year after the First unless and until he has been notified in writing by the Contracting Officer of an increase in availability of funds * * *. If so notified, the Contractor's obligation shall be increased only to the extent contract performance is required for the additional Program Year for which funds have been made available." DAR 7–104.47(d).

Section H–7(2)(a)(b) and (c) set forth, inter alia, the consequences for cancellation of the Second, Third and Fourth Program Years of the contract, i.e., the contractor would be paid as consideration therefor, a cancellation charge not to exceed 6.25% of the total multi-year contract amount, excluding data items. If the Third and Fourth Program Years were cancelled, the figure was 5.11%, and if the Fourth Program Year was cancelled, the figure was 3.19%. Section H–7(3) of the contract provided in pertinent part:

> The contracting officer shall notify the contractor in writing of the purchase of the Second, Third and Fourth Program Years no later than 210 days prior to the first scheduled delivery of each program year. Bidders on the contract were allowed to submit different unit prices for each program year within the limitations set forth in Section H–7(6).

Section H–7(5) stated in pertinent part:

> A price must be submitted only for the total requirements of the Multi–Year procurement. A bid or offer on a single year quantity will be disregarded for any purpose but will not render the bid or offer non-responsive as to any alterna-

tive multi-year submission by the same bidder or offeror.

There does not seem to be any dispute about the view that section H–8 assumed that bidders included an amount for anticipated economic price and cost fluctuations in their bids on the contract in question.

Section H–8(p) of the EPA provision of the contract provided in pertinent part as follows:

> In the event the Contracting Officer authorizes labor effort or acquisition of specific materials or components prior to First Article Approval, in accordance with paragraph (g) of the First Article Approval–Contractor Testing Clause, the contractor agrees that the percentage of the unit price of Items 0001AA, 0003, 0004AA, 0005, 0006AA, 0007, 0008AA and 0009 [which are the line item numbers for *all four program years and their options*] attributable to labor and materials, and subject to adjustment will be reduced to reflect only the percentage of the unit prices of remaining labor materials or components not authorized for pre-First Article acquisition.

This clause is the focal point of the dispute between the parties.

On November 3, 1982, F. Paul Dunlevy, plaintiff's Director of Engineering, wrote to AMRC in pertinent part as follows:

> Beta Systems Inc., in accordance with Clause E–7 of the above referenced contract, hereby requests authorization to procure all of the materials listed on the attached sheet.
>
> The contract timetable, as established by Section F–2, requires production unit deliveries within 365 days ADC. The First Article Approval as established by Section E–5 is not due until 315 days ADC. Normal production planning lead times require subassemblies and purchased components in plant NLT 30 days prior to beginning final assembly. Raw materials are required 60–90 days prior to beginning final assembly.
>
> The total of our production lead times combined with the vendor lead times shown on the attached sheet clearly indicate that procurement of these materials

prior to FAT approval is required in order to meet the contract schedules.

The attached sheet, referred to in the November 3, 1982 letter, contained the following information:

| ITEM | LEAD TIMES |
| --- | --- |
| Aluminum Sheet and Plate Alloys 5086–H32, 5456–H321, 6061 T6511 | 12–16 wks ARO |
| Outside Fabrication of Aluminum Sheet & Plate | 4 wks AR material |
| Pump, electric motor, control cables, etc | 6 mos ARO |
| Aluminum Extrusions | 8 wks ARO |
| Hose Reels | 12–16 wks ARO |
| Manholes | 12–16 wks ARO |
| Aluminum Castings | 6–8 wks ARO |
| Rubber Hose MIL–H–370 | 8–10 wks ARO |
| MIL–C–27487 Fittings | 12–16 wks ARO |
| AN and MS Fasteners & Hardware | 8–10 wks ARO |
| MIL–Spec Paints & Finishes | 4–6 wks ARO |
| Dispensing Valve | 8–10 wks ARO |
| Swivel Joints | 6–8 wks ARO [2] |

The contracting officer, Kent A. Pickering, replied to Dunlevy's letter, set out above, on November 26, 1982 in pertinent part as follows:

Reference your letter of 3 November 1982 regarding authorization to procure materials for contract DAAJ09–82–C–D223.

Authorization ishhereby [sic] given to procure these materials prior to First Article Approval in order to meet contract schedule. List of materials is inclosed.

The list of materials referred to in this letter was a copy of the list attached to Dunlevy's letter of November 3, 1982.

On March 19, 1983, Pickering sent a telex to plaintiff which read in pertinent part as follows:

Conditional approval of first article test report for subject contract is hereby given. Production on subject contract can proceed with the exception of the assembly of junction box and associated wiring, to include wiring between the junction box and motor. This exception also applies to fabrication of the monitoring plate and bracket for the junction box.[3]

On or about December 23, 1982, plaintiff submitted its First Article for approval by AMRC. First Article Approval was issued by AMRC on September 7, 1983.

---

**2.** Dunlevy, in his affidavit, states that the listing on this attached sheet "included all materials necessary to manufacture a liquid dispensing tank and pump unit" and "constituted 100% of the materials necessary to manufacture a liquid dispensing tank and pump unit." Defendant believes these statements to be incorrect and misleading because the listing did not specify that it included *all* materials necessary to manufacture a liquid dispensing tank and pump unit and because, under defendant's reading of the contracting officer's letter of November 26, 1982, *infra*, it only authorized the purchase of materials for the units to be delivered under the First Program Year of the contract. Defendant relies on the Declaration of Pickering, the contracting officer, who declared, "In my November 26, 1982 letter, I did not authorize Beta to purchase materials for the units that might be purchased by the Government for the Second, Third, or Fourth Program Year of the contract and I did not authorize Beta to purchase materials for the Second, Third, Fourth Program Year Options that might be exercised by the Government...."

**3.** The parties are at odds over the meaning of this telex. Relying on Dunlevy's affidavit, plaintiff avers that this telex authorized it to proceed with production on the contract; that this authorization predated the Government's First Article Approval; and that the only limitation to this authorization was related to a portion of the work covered by a defective government specification. Plaintiff states that the per unit cost of the labor associated with work limitation excluded from pre-First Article approval authorization was $46.16. Defendant, on the other hand, believes plaintiff's above averments are incorrect and misleading. Defendant, relying on Pickering's Declaration, maintains that the March 19, 1983 telex only gave plaintiff authorization to proceed with production on the First Program Year units, except for the assembly of the junction box and other related work, the work limitation referred to by plaintiff. Defendant stresses, relying on Pickering's Declaration, that the March 19, 1983 telex did not authorize plaintiff to commence with production and incur labor effort for any year but the First Program Year; that no funds had been authorized for the Second, Third, or Fourth Program Years when the November 26, 1982 and the March 19, 1983 telex were written; and that AMRC, as of the above dates, had not notified plaintiff in writing of the purchase of any Second, Third, or Fourth Program Year units, nor had AMRC exercised its Options for those Program Years.

On February 6, 1987, the contracting officer issued a final decision unilaterally adjusting the contract price downward, under the EPA provision of the contract, for the Second Program Year. The amount of the downward price adjustment was $334,003.80, reflecting a decrease in inflation. On August 24, 1987, the contracting officer unilaterally adjusted the contract price downward for the Second Program Year Option and the Third Program Year Option by $198,362.77 and $8,161.89 respectively. These downward adjustments were based upon differences between actual and forecasted materials and labor indices.

The Federal Circuit in *Beta Systems, supra,* interpreted section H–2(p) relative to the First Program Year and Option. It stated:

> [S]ub-clause (p) provides that when labor effort and materials acquisition are authorized by the contracting officer prior to First Article Approval, these authorized costs are not included in the adjustment. In accordance with sub-clause (p) only those labor, materials, and component costs that are not authorized prior to First Article Approval are subject to the adjustment, to the maximum of 70% of the contract price as set in sub-clause (a)". 838 F.2d at 1181–82.

The question for consideration at this time is whether the materials and labor effort acquired for the Second Program Year and Option and the Third Program Year Option in the context of section H–8(p) were authorized by the contracting officer in his letter of November 26, 1982 and in his telex of March 19, 1983.

## DISCUSSION

■ With respect to the question of the proper interpretation to be placed on section H–8(p), this court does not write on a completely clean slate. As mentioned earlier, the Federal Circuit discussed this issue (which was Count II in docket No. 738–85C but is now Count I in docket No. 77–88C) in its opinion in *Beta Systems, Inc. v. United States, supra,* 838 F.2d at 1183–84, Part E. Since Count II in docket No. 738–85C was dismissed without prejudice by this court in a Memorandum Opinion dated October 9, 1986, and was not appealed to the Federal Circuit, a fact noted by the Federal Circuit (838 F.2d at 1183–84), the Federal Circuit's discussion on the matter, vis-a-vis the interpretation to be placed on section H–8(p) relative to the claims under Count I of docket No. 77–88C, can be viewed as considered dictum.[4]

■ The parties in their briefs generally eschew resort to extrinsic evidence as an aid relative to the interpretation question before the court.[5] Rather, the parties rely

---

4. This court is required to give weight to the pronouncements of the Federal Circuit even if they appear by way of dictum. *See Highland Supply Corp. v. Reynolds Metals Co.,* 245 F.Supp. 510, 512 (E.D.Mo.1965); *Accord, Max M. v. Thompson,* 585 F.Supp. 317, 324 (N.D.Ill.1984). *But see F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476, 1479 (Fed.Cir. 1983). It cannot be presumed that the Federal Circuit writes merely for "intellectual exercise". *See Dunning v. United States,* 232 F.Supp. 915, 923 (W.D.Mo.1964). *See also Hawks v. Hamill,* 288 U.S. 52, 59, 53 S.Ct. 240, 242, 77 L.Ed. 610 (1933) (considered dictum has capacity, though it be less than a decision, to tilt the balanced mind toward submission and agreement). The dictum in question is deemed to be more than "dubious dictum". See *Webco Lumber, Inc. v. United States,* 230 Ct.Cl. 457–65, 677 F.2d 860, 864 (1982).

5. In interpreting the language of a contract, of significant importance is the intent of the parties at the time the agreement was consummated. *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). In dealing with the intent of the parties relative to whether the initial authorization to acquire materials and labor before First Article Approval applied only to the EPA for the First Program Year, as claimed by the Government, or embraced all four program years, as urged by the plaintiff, the Federal Circuit, rejected affidavits filed by the parties as a basis for determining intent. The Federal Circuit ruled that the intent question, as presented by the parties, was a question of fact and directed that "[t]hat portion of the summary judgment which decided this question of intent [favorable to the Government] is vacated." 838 F.2d at 1183–1184. In their motions for Partial Summary Judgment on Count I in Docket No. 77–88C the parties again submit an affidavit and a declaration relative, inter alia, to the intent question. Neither party, however, addresses the intent question in a significant fashion in their briefs. In the final analysis, the court concludes that the intent each side proffers, by way of extrinsic

on the provisions of the contract alone in urging the court to adopt the interpretation they placed on the contract language. As a result, "[t]he parties' intent must be gathered from the instrument as a whole." *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973). *See also ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751, 524 F.2d, 680, 684 (1975).

Both parties agree that the contract in issue must be considered as a whole, *Merando, Inc. v. United States*, 201 Ct.Cl. 28, 30, 475 F.2d 603, 605 (1973), and that, where possible, all contractual provisions must be given effect with no portion thereof rendered useless or meaningless. *Martin Lane Company, Inc. v. United States*, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970). Both argue that the language of section H–8(p) is clear and unambiguous, yet, they proffer differing interpretations of said "clear and unambiguous" language. To the extent the language is unclear or ambiguous, plaintiff argues that the Government, as the contract drafter, must bear the risk of any language uncertainty or ambiguity, *Sturm v. United States*, 190 Ct.Cl. 691, 697, 421 F.2d 723, 727 (1970); *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418 (1947). The Government counters this argument by claiming that the contract provisions are clear and unambiguous as a matter of law and that, even if considered ambiguous, plaintiff's interpretation of section H–8(p) is unreasonable when considered in context with other contract provisions and applicable regulations.

■ Defendant states that section H–8(p) of the EPA provision empowers that contracting officer to authorize the purchase of materials and labor effort for all program years and options but only to the extent the program year(s) and option(s) is (are) funded. Defendant further agrees that all materials and labor effort authorized prior to First Article Approval by the contracting officer shall be excluded from any economic price adjustment.[6] Since the First Program Year and Option was funded prior to First Article Approval, defendant concedes that the First Program Year and Option materials and substantial labor effort were properly subject to exclusion from any economic price adjustment. However, since subsequent program years and options were not funded at the time of First Article Approval, the materials and all labor effort for such program years and options are subject to the economic adjustment provision.

Reading section H–8(p) alone reasonably supports plaintiff's position that its terms embrace all program years and options. Section H–8(p) refers to all program years and options, by referencing their contract line Item "CLIN No", specifically without any limitation.[7] Defendant really does not argue to the contrary. Instead, defendant stresses that one must look to other contract provisions, as well as the multi-year provisions of the Defense Acquisition Regulations (DAR), in interpreting section H–8(p).

Defendant points to the multi-year nature of the procurement in question and

---

evidence, is their subjective unexpressed intent. Such intent is not important as an aid to interpretation of a contract. *See ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680 (1975) and cases cited therein. *See also Firestone Tire & Rubber Co. v. United States, supra*, 195 Ct.Cl. at 30, 444 F.2d at 551. Accordingly, the intent of the parties in this case must be determined on the basis of construction and interpretation of the contract language alone.

**6.** In response to plaintiff's letter of November 3, 1982 requesting authorization to procure all the materials listed on an attached sheet, the contracting officer, by letter dated November 26, 1982, authorized the procurement of these listed materials prior to First Article Approval. There

is no dispute about the fact that the listed materials were all the materials needed to supply the items called for by the contract, i.e., liquid dispensing tank and pump units. On March 19, 1983, the contracting officer authorized the expenditure of most of the labor necessary to manufacture the unit called for by the contract. First Article Approval was granted on September 7, 1983.

**7.** The fact that plaintiff in its bid submission was required to submit unit prices for all four program years and options and that contract award was based on all unit bid prices for all Programs Years and Options serves to corroborate the reasonableness of such a reading. *See* section H–7(5) of the contract.

directs attention to section H–7 [8] of the contract and applicable regulations, specifically DAR 7–104.47,[9] which gives the Government the right to cancel the Second, Third and Fourth year requirements of the contract and required written notice for the purchase of units for the Second, Third and Fourth Program Years.

The heart and soul of defendant's argument is that under DAR 7–104.47 funding for the multi-year procurement was accomplished on a yearly basis. While funding was available for the First Year Program prior to First Article Approval, funding was not so available for the Second, Third and Fourth Program Years. Since said funding was not available, defendant concludes, the contracting officer could not authorize expenditures for those Program Years and the Government was not obligated to procure contract items for those Programs Years.

From the perspective of contract performance, defendant's argument is correct. However, it misses the point of the dispute. The dispute does not center on contract performance but on contract price. The EPA clause is concerned with contract price and when said price would be subject to adjustment. The EPA clause does not require or relate to actual purchases. This critical distinction serves as an answer to defendant's argument based on its reading of the cryptic and ambiguous letters of November 3, and 26, 1982, a matter much discussed at oral argument. The EPA clause only requires the act of authorization. Further, the EPA clause does not limit the effect of the authorization to the First Program Year. Indeed, all four programs and options are referenced in said clause suggesting that any authorization unless specifically limited, would cover all program years and options.

■ Acceptance of plaintiff's interpretation of the section H–8(p) is in no way inconsistent with or inimical to the provisions of section H–7 or DAR7–104.47. Plaintiff's interpretation does not, as defendant argues, obligate the Government to purchase units for all program years and their options. Thus, defendant's reliance on the Anti–Deficiency Act, 31 U.S.C. § 1341 (1982) as support of its argument is

**8.** Section H–7 was entitled "Multi–Year Procurement." This section provided inter alia, that in the event of the cancellation of the Second and/or Third and/or Fourth Program Year requirements, plaintiff was to be paid as consideration therefor a cancellation charge of not to exceed 6.35% of the total multi-year contract amount, excluding data items if all three Program years were cancelled and 5.11% if the Third and Fourth Program Years were cancelled. This section further provided, inter alia, that the contracting officer shall notify the contractor in writing of the purchase for the Second, Third, and Fourth Program Year no later than 210 days prior to the first scheduled delivery of each program year. It is to be noted that the total multi-year contract price is utilized in computing the cancellation charge, not the individual program year prices. See in this regard *Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 113, 591 F.2d 635, 636–37 (1979).

**9.** Dar 7–104.47, relied on by defendant, is entitled "Limitation of Price and Contractor Obligations (1966 Oct)". It provides, in pertinent part as follows:

(b) Funds are available for performance of this contract in the amount specifically described in the Schedule, as available for contract performance. The amount of funds so described at the time of award is not con-

sidered sufficient for the contract performance required by and described in the Schedule for any Program Year other than the First Program Year. Upon availability to the Contracting Officer or additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer shall, not later than the date specified in the Schedule, unless a later date is agreed to by the parties, so notify the Contractor in writing and the amount of funds described in the Schedule as available for contract performance shall be modified accordingly. This procedure shall apply for each successive Program Year.

(c) The Government is not obligated to the Contractor for contract performance in any monetary amount in excess of that described in the Schedule or modifications thereto, as available for contract performance.

(d) The Contractor is not obligated to incur costs for the performance required for any Program Year after the first unless and until he has been notified in writing by the Contracting Officer of an increase in availability of funds in accordance with paragraph (b) of this clause. If so notified, the Contractor's obligation shall be increased only to the extent contract performance is required for the additional Program Year for which funds have been made available.

misplaced. Adopting plaintiff's interpretation does not create any obligation for subsequent program years until funds have been made available and the contractor notified thereof. It does obligate the Government, however, if it does purchase units, for subsequent program years, as it has, to forego economic price adjustment under the plain wording of section H–8(p). Plaintiff's interpretation does not, and did not, impinge in any way on the Government's right to cancel any program year and option.[10] The Federal Circuit in its opinion in *Beta Systems Inc. v. United States, supra,* clearly supports these observations. *See* 838 F.2d at 1183, n. 2. *See also* 2 McBride and Wachtel, Government Contracts, ¶ 18.120 (1987) (MultiYear Procurement). Defendant's argument in this regard is really an *in terrorem* one since all Program Years and Options involved in the multi-year procurement before the court have now been funded.

The fact that the requirements for the years after the first year in a multi-year procurement are unfunded does not make a multi-year contract an option contract, which is, in essence, the apparent thrust of defendant's argument. Further, defendant's emphasis on funding is misplaced in this case. Some 220 of the 248 units ordered under the First Program Year Option were unfunded at the time of issuance of both the November 26, 1982 and March 19, 1983 material and labor authorizations. Nonetheless, the Federal Circuit found the above authorizations resulted in the exclusion of these labor and materials from any EPA adjustment in its *Beta* decision discussed above. This fact is not without some significance. The Government's actions in ordering units prior to the availabil-

ity of fundings for said units provides support for the interpretation advanced by plaintiff in this case. It certainly does not support defendant's interpretation position. *See Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 620, 427 F.2d 1233, 1240 (1970) (conduct of party during contract performance before controversy arose demonstrative of intention and entitled to great weight).

 The Government's obligation to purchase its full requirements for the multi-year period involved is based upon definitive needs with the possibility of funds being unavailable for years after the first year too remote and speculative to affect the definitive quantity, fixed price nature of the multi-year procurement arrangement, *See* 43 Comp.Gen. 215 (1963). The contract binds the Government to purchase the entire multi-year procurement quantity and to fund the successive Program Years. This obligation is mandatory unless there is an appropriate and justified cancellation or the bona fide unavailability of funds. *See Appeal of Varo, Inc.,* ASBCA No. 13739, 70–1 BCA 8099, pp. 37, 627–28 (1969) [1969 WL 731].[11] *See United States v. Purcell Envelope Co.,* 249 U.S. 313, 322, 39 S.Ct. 300, 303, 63 L.Ed. 620 (1919).

Viewing the contract as a whole, and giving due consideration to the nature of multi-year procurement as espoused by the Federal Circuit in its *Beta* opinion (838 F.2d at 1183, n. 2), plaintiff's interpretation of section H–8(p), as embracing authorization to acquire materials and labor before First Article Approval, applies to the EPA for all four program years and options, is deemed to be within the zone of reasonableness, *Bishop Engineering Co., Inc. v. United*

---

**10.** Defendant's efforts to establish lack of harmony between plaintiff's interpretation and other contract provisions, e.g., section E–5 (Procurement of Long Lead Materials) is likewise unpersuasive.

**11.** It is to be remembered that plaintiff in its bid was required to submit prices for all program years in the multi-year procurement. Thus, solicitation of prices for the contract items was based on total program year quantities. In the event of cancellation, the contractor was to be paid a cancellation charge, which charge was

expressed in the contract as a percentage of the total multi-year contract price and would represent the start up costs which normally would be amortized in *all* items to be furnished under the multi-year procurement requirements. Multi-year procurement contracts are, in essence, single, indivisible entities. As a result, an equitable adjustment following termination of a multi-year contract must be based upon the entire contract. *See Appeal of Varo, Inc.,* ASBCA 16606, 72–2 BCA 9720 (1972) [1972 WL 1765].

*States,* 180 Ct.Cl. 411, 415–16 (1967), and constitutes a reading of said section from the perspective of a reasonably intelligent person acquainted with the contemporary circumstances. *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). As indicated above, such an interpretation is directed only at contract price and not contract performance. Viewed in this light, plaintiff's interpretation does not conflict with or render meaningless any other contract clause. Viewed in this light, defendant's alternative argument that the contract contained a patent ambiguity which plaintiff was obligated to call to the Government's attention before it submitted its bid is without merit.[12]

Defendant also contends that plaintiff's interpretation of the contract is "unreasonable because it assumes authorization when no authorization was given." Plaintiff's interpretation makes no such assumption. Again, defendant confuses contract performance with contract price. The dispute in this case centers on whether adjustments to the contract price are excluded by operation of section H–8(p). That section does not deal with the contract performance.

Defendant stresses the Pickering Declaration in an effort to show that the contracting officer did not, prior to First Article Approval, authorize material costs and/or labor expenditures for the Second Program Year, its Option, or the Third Program Year Option.[13] The only documentation directly bearing on this matter are the November 3, 1982 letter from plaintiff to AMRC requesting "authorization to procure all the materials listed on the attached sheet", the November 26, 1982 letter from the contracting officer (Pickering) to plaintiff giving "[A]uthorization ... to procure these materials....", and the March 19, 1983 telex from the contracting officer to plaintiff authorizing labor effort with one minor exception. All of these materials, as well as defendant's present argument, were before the Federal Circuit in the *Beta* case (838 F.2d 1179). The Federal Circuit rejected this court's holding that the November 26, 1982 authorization only applied to the First Program Year. (838 F.2d at 1182–84). Instead, the Federal Circuit viewed the dispute relative to the above documentation, in light of the conflicting affidavits and the neutral nature of the documents themselves, as presenting a "question of what Beta intended to request and what the contracting officer intended to authorize.... (838 F.2d 1183–84). The Federal Circuit ostensibly

**12.** Defendant argues that acceptance of plaintiff's interpretation creates ambiguity in the contract. Plaintiff counters with the observation that in its consideration of section H–8(p) in *Beta v. United States, supra,* the Federal Circuit did not find section H–8(p) to be ambiguous. Plaintiff responds that if there is such an ambiguity in the contract, then an interpretation must be given to the contract which is more favorable to the plaintiff since the Government drafted the provisions in question, *citing Tibshraeny Bros. Constr., Inc. v. United States,* 6 Cl.Ct. 463, 468 (1984). Defendant counters that such an ambiguity in the contract would be so "patent and glaring" as to impose an affirmative duty on plaintiff to seek clarification from the Government before submitting its bid, *citing,* inter alia, *Fortec Constructors v. United States,* 760 F.2d 1288 (Fed.Cir.1985). Thus, defendant continues, plaintiff must bear the risk of misinterpretation. Finally, defendant asserts that even if the ambiguity is deemed not to be "patent and glaring", plaintiff's interpretation is unreasonable because, inter alia, it would result in a contract that violated the Anti–Deficiency Act.

As indicated above, plaintiff's interpretation is deemed reasonable and does not and could not violate said Act under the circumstances. In the final analysis, one can generally twist a group of words into an ambiguity by strained construction or unbridled reading of the contract. This, however, should not be done. *Dana Corp. v. United States,* 200 Ct.Cl. 200, 216, 470 F.2d 1032, 1043 (1972).

**13.** DAR 7–104.47(c) provides that the Government, under a multi-year procurement, "is not obligated to the contractor for contract performance in any monetary amount in excess of that described in the schedule or modifications thereto, as available for contract performance." DAR 7–104.47(d) provides that the contract "is not obligated to incur costs for the performance required for any program year after the First unless and until he has been notified in writing by the contracting officer of an increase in availability of funds...." There is no reference to any limitation on contract price adjustment, only on contract performance, in these regulations.

envisioned the necessity of a trial on this question.

The parties did not seek a trial on this matter, but instead filed partial motions for summary judgment. This court, in informal conferences with the parties had discussed this matter of trial with counsel, inter alia. The matter of trial was again discussed at oral argument. The parties insisted a trial was not necessary, presumably because the intent involved in this case was subjective, not objective intent. The parties insisted on travelling the motions route to disposition of this litigation. Each party presented affidavits and/or declarations together with their motions, plus arguments, which were significantly similar to those before the Federal Circuit when it rendered the *Beta* opinion discussed above. The conclusion drawn from this action by the parties is that the intent of both parties, i.e., what Beta intended to request and what the contracting officer intended to authorize, was subjective, unexpressed intent. That is, Beta intended to request authorization to acquire all materials and labor before First Article Approval but never expressed such an intent in writing (except by way of the neutral language of its November 9, 1982 request) or otherwise to the contracting officer, and the contracting officer only intended to authorize the approval of acquisition of materials and labor for the First Program Year only but never expressed such an intent in writing (except by way of his November 26, 1982 letter and the March 19, 1983 telex) or otherwise to plaintiff. As indicated earlier (see n. 5, *supra*), such subjective, unexpressed intentions of the parties are not binding on the other party, *See Kohler Co.*

*v. United States*, 204 Ct.Cl. 777, 787, 498 F.2d 1360, 1365 (1974), and are of little help to the court under the circumstances. This is a case where the parties' subjective intention is of no assistance. *See Deloro Smelting and Refining Co., Ltd. v. United States*, 161 Ct.Cl. 489, 494, 317 F.2d 382, 385 (1963). Since reliance is not to be had on extrinsic evidence the terms of the contract control.

Given this state of affairs, the court is left to resolve the matter, as it has above, by recourse to the language of the contract to determine the intent of the parties. The Federal Circuit's prior decision in this case in totality, and the dictum in particular, relating to the issue decided herein, tilted the court's thinking toward this result reached herein. *See* n. 4, *supra*.[14]

## CONCLUSION

Upon consideration of the submissions of the parties, and after oral argument, the court concludes that defendant's partial motion for summary judgment is denied and plaintiff's like motion is granted. As a result, the authorization to acquire materials and labor before First Article Approval applies to the EPA for the Second Program Year and Option and the Third Program Year Option.[15] The parties are to take steps to implement this holding and are to advise the court within sixty-days of this decision of the status of this effort.

---

14. Plaintiff states in its reply brief that the Federal Circuit "gave the parties and this court a strong signal that limiting the application of Subparagraph (p) [section H–8] to the First Program Year and its Option would be incorrect. The only rational inference to be drawn from footnote 2 of the [Federal Circuit] decision [838 F.2d at 1183] is that the Government's argument regarding the applicability of the ADA [Anti–Deficiency Act] is meritless. Any other reading of that portion of the Federal Circuit's opinion would render it meaningless." In its argument, plaintiff stresses, repeatedly, that portion of footnote 2 of the Federal Circuit's opinion which reads, in pertinent part, "When the

government enters into a multi-year procurement, as here, the negotiated terms apply to the full procurement whether or not funding has been approved for all years of the contract."

15. The Third Program Year and Fourth Program Year and Option were not set forth as claims in these consolidated cases since they had not been the subject of decisions by the contracting officer at the time these suits were filed. However, the determinations reached herein should be equally applicable to those Programs Years and Options.