PAULINE NEWMAN, Circuit Judge.
 

 Beta Systems, Inc. appeals the decision of the United States Claims Court granting the government’s motions for summary judgment as to Counts I and III of Beta’s complaint.
 
 [1]
 
 We reverse, and remand for appropriate proceedings.
 

 At issue are certain aspects of a contractual arrangement between Beta and the Army Troop Support and Aviation Materiel Readiness Command, and specifically section H-8 of the contract, the Economic Price Adjustment (“EPA”) clause. The contract provides for the procurement of several thousand tank/pump units over a period of four Program Years. Section H-8 provides for upward or downward adjustment of the contract price depending,
 
 inter alia,
 
 on changes in material and labor costs as measured by the Bureau of Labor Statistics (“BLS”) index for “Machinery
 
 &
 
 Equipment, Code 11”.
 

 Based on this index the contracting officer reduced the contract price. Beta states that its costs did not decrease, but instead dramatically increased due to unusual increases in the price of aluminum, and that this particular BLS index was a grossly inaccurate measure of the economic factors pertinent to the contract. Beta also asserts that because certain material and labor costs had been authorized before First Article Approval, inclusion of these costs in the section H-8 calculation was incorrect.
 

 Count I
 

 The Claims Court’s decision on Count I, relating to the EPA calculation for the First Program Year of the contract, was certified on the issue of liability; this appeal is pursuant to 28 U.S.C. § 1292(d)(2).
 

 Count I, turning on interpretation and application of section H-8, was decided in the government’s favor on cross motions for summary judgment. The following sub-clauses of section H-8 are asserted by Beta to have been misinterpreted or misapplied:
 

 a. Seventy percent (70%) of the price set forth in this contract is subject to adjustment for unanticipated economic fluctuation. That portion of the price (70%) will be deemed by the Government to include an amount for anticipated economic fluctuation based on the factors
 
 *1181
 
 set forth in Table I. The remaining thirty percent (30%) of the price is not subject to the provisions of this clause.
 

 * * * * * *
 

 p. In the event the Contracting Officer authorizes labor effort or acquisition of specific materials or components prior to First Article Approval, in accordance with paragraph (g) of the First Article Approval—Contractor Testing Clause, the contractor agrees that the percentage of the unit price of Items 0001AA [the tank/pump units for the First Program Year], 0003 [the units for the First Program Year Option], 0004AA [the units for the Second Program Year,] 0005 [the Second Program Year Option], 0006AA [the Third Program Year], 0007 [the Third Program Year Option], 0008AA [the Fourth Program Year] and 0009 [the Fourth Program Year Option] attributable to labor and materials, and subject to adjustment will be reduced to reflect only the percentage of the unit prices of remaining labor materials or components not authorized for pre-First Article acquisition. [Bracketed words are added]
 

 Count I raises primarily legal questions of contract interpretation, and is amenable to summary resolution.
 
 See Mingus Constructors, Inc. v. United States,
 
 812 F.2d 1387, 1390 (Fed.Cir.1987) (“Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law”).
 

 A
 

 With respect to the method of calculation of the 70% of the price that is subject to adjustment, the Claims Court held as follows:
 

 The adjustment called for under section H-8 is to utilize the contract award price for the First Program Year; that portion of the contract award price representing material costs is to be reduced, up to 70 percent, by the costs of materials, excluding the cost of aluminum alloy 5086-0, set forth on the list appended to plaintiffs November 3, 198[2], letter to the Army; labor costs are not to be eliminated from the contract award price for adjustment purposes. Finally, the November 26, 1982, pre FAA [First Article Approval] authorization only applied to the First Program Year.
 

 Beta assigns error to this holding, which it interprets as meaning that subclause (a) requires that 70% of the material cost component only, not 70% of the total contract price, is subject to adjustment. Indeed, the Claims Court so clarified its holding: “Stated simply, under section H-8(p), up to 70 percent of the material and labor cost percentage of the contract award price that was pre-FAA authorized can be deducted from the contract award price for EPA clause adjustment purposes.” Therefore, according to the Claims Court, when material and labor costs are authorized pre-FAA, as contemplated by subclause (p), only 70% of these pre-FAA authorized costs can be deducted from the 70% of the contract price that is available for adjustment pursuant to the EPA clause.
 

 Beta argues that this is a misreading of Section H-8. Beta states that the 70% in sub-clause (a) plainly means that 70% of the
 
 total
 
 contract price is subject to adjustment, not 70% of that portion of the contract price that represents material and labor costs. Beta states that the Claims Court’s holding is contrary to the plain reading of sub-clause (a); and we must agree. See, for example, sub-clause H-8(q), which, in an example of how to calculate the EPA adjustment, utilizes 70% of the total contract price. See also DAR 3-404.3(c)(3)c.l0 (1981). Although the government asks that we affirm the, court’s analysis, it offers no defense or explanation thereof, and points to no support in the contract or elsewhere for its reading.
 

 B
 

 Sub-clause (p) provides that when labor effort and materials acquisition are authorized by the contracting officer prior to First Article Approval, these authorized costs are not included in the adjustment. In accordance with sub-clause (p) only those labor, materials, and component costs
 
 *1182
 
 that are not authorized prior to First Article Approval are subject to the adjustment, to the maximum of 70% of the contract price as set in sub-clause (a).
 

 Beta states that it was authorized, before First Article Approval, to incur labor and material costs that exceeded 70% of the contract price for the First Program Year (the only year included in Count I); and that once these authorized costs exceeded 70% of the contract price, that ended the inquiry, and no adjustment was available for that Program Year. Beta ignores the final phrase of sub-clause (p), which provides that when costs are authorized prior to First Article Approval, the “reduced” percentage subject to adjustment will “reflect only the percentage of the unit price of
 
 remaining
 
 labor materials or components” (emphasis added). Thus, any post-First Article Approval costs remain adjustable under the EPA clause, up to 70% of the contract price.
 

 C
 

 The Claims Court also held that sub-clause (p) eliminated from section H-8 adjustment all labor and materials costs authorized after “conditional” First Article Approval. Thus, the court held that conditional First Article Approval had, for the purposes of Section H-8(p), the same effect as actual First Article Approval, which occurred six months later. Beta correctly states that this is legal error.
 

 The several contractual events that depend on First Article Approval did not and do not occur at the time of conditional First Article Approval. These separate stages of approval, and their consequences, are not interchangeable.
 

 The government argues that the conditional approval was conditional only because, due to defective government specifications, a “minor component” (in the government’s words) could not be completed; thus, the government asserts, the conditional approval was correctly treated by the Claims Court as final First Article Approval under the contract. No authority for this position is offered by the government, nor any explanation of why a matter that took six months to correct must be deemed “minor” in terms of substantive legal consequences.
 

 The contract requires that following receipt of the First Article Approval test report, the contracting officer “shall ... approve, conditionally approve, or disapprove such first article.... A notice of conditional approval shall state any further action required of the Contractor”. Contract Section E defines several events whose timing is controlled by First Article Approval, and is specific as to the consequences or availability of conditional approval. Clause E-7 and sub-clause E-5(g) provide for government authorization to acquire long lead materials “prior to First Article Approval”. The terms “First Article Approval” and “Conditional First Article Approval” are not used interchangeably.
 

 We hold that the Claims Court erred in its limitation of costs in this calculation to those incurred before the date of the conditional First Article Approval. It is the . actual First Article Approval that controls the calculation in sub-clause H-8(p), as is stated therein.
 

 D
 

 The Claims Court held that the aluminum alloy used by Beta in performing the contract, alloy 5086-0, was not included in Beta’s request for pre-First Article Approval authorization, and that no labor costs were authorized prior to First Article Approval.
 

 As for the authorization with respect to the aluminum alloy 5086-0, the government does not dispute that this is the alloy used throughout the entire contract, with full knowledge of the government, and that this alloy was used in the prototypes for which conditional First Article Approval, and subsequently final First Article Approval, were given. There is no basis for excluding this principal material of construction from the authorized materials, when there is no dispute as to the authority of Beta to use this material.
 

 
 *1183
 
 The Claims Court also held that the government’s telex of March 19, 1983, which granted conditional First Article Approval and authorized production as follows: “Production on subject contract can proceed with the exception of the assembly of junction box and associated wiring”, did not constitute pre-First Article Approval authorization for labor effort in terms of sub-clause (p). The reasoning for the court’s holding was that this telex granted actual, not conditional, First Article Approval: an error of law, as we have discussed. When viewed in the legally correct light, this telex necessarily preceded (indeed, by six months) the actual First Article Approval, and comes within Section E-5, sub-clause (g), which states that “prior to approval of the first article(s), the Contractor may, upon written authorization by the Contracting Officer ... commence production to the extent essential to meet production quantity delivery requirements”. First Article Approval was granted on September 7, 1983, and first delivery under the contract was due on September 29, 1983; it is not disputed that labor effort, well before First Article Approval was granted, was “essential to meet production quantity delivery requirements”.
 

 Production was correctly authorized pri- or to First Article Approval, and the accompanying labor effort is thus removed from the EPA adjustment pursuant to sub-clause (p).
 

 E
 

 The government argues that the initial authorization to acquire materials and labor before First Article Approval applies only to the EPA for the First Program Year. Beta says that this is contrary to the contract, pointing to the inclusion in subclause (p) of the line Item identifying numbers for the four Program Years and the four options; and also contrary to the intent of the parties. The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face.
 
 SCM Corp. v. United States,
 
 675 F.2d 280, 284, 230 Ct.Cl. 199 (1982). However, the government adduced evidence in the form of an affidavit of the contracting officer that he intended to authorize only materials for the first year. Beta submitted a conflicting affidavit of its director of engineering. The parties thus raised a question of material fact underlying the issue of contract interpretation. To the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution.
 
 See
 
 S. Williston, A Treatise on the Law of Contracts § 616, at 649, 652 (3d Ed.1961) (“The general rule is that interpretation of a writing is for the court.... Where, however, the meaning of a writing is uncertain or ambiguous, and parol evidence is introduced in aid of its interpretation, the question of its meaning should be left to the jury”);
 
 accord
 
 A. Corbin, Corbin on Contracts § 554 (1960) (“The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law”);
 
 see also id.
 
 § 554C (Supp.1982) (“[W]e may lay down as a rule of law that a jury is always required when the question as to the proper interpretation of a contract requires an express judicial determination of the credibility of the parties or their witnesses”).
 

 This question of what Beta intended to request and what the contracting officer intended to authorize is now material only to Count II,
 
 [2]
 
 which was dismissed without
 
 *1184
 
 prejudice and was not appealed. That portion of the summary judgment which decided this question of intent is vacated.
 

 F
 

 In summary, the bases on which the Claims Court granted summary judgment to the government on Count I are in error: the equating of conditional with actual First Article Approval; the denial that pre-First Article Approval authorization of labor costs occurred; the exclusion of the aluminum alloy that was used in the construction; and the method of calculation of the 70% limitation. The grant of summary judgment in favor of the government on Count I is reversed.
 

 Beta’s cross-motion for summary judgment on Count I requested judgment in its favor on these same issues. As a matter of law, based on our holdings that (1) 70% of the total contract price, not 70% of the material cost, is subject to the EPA under sub-clause (a); (2) labor effort and material and components authorized before actual First Article Approval are subject to the exclusion of Section H-8 sub-clause (p); and (3) the aluminum alloy that was used and approved is not excluded from pre-First Article Approval authorization; we direct that judgment on Count I be entered in favor of Beta.
 

 The decision restricting the pre-First Article Approval authorization to the first program year is vacated; we reiterate that this issue appears to be pertinent only to Count II.
 

 Count III
 

 In Count III Beta sought reformation of section H-8 based on mutual mistake and error of law, asserting that the EPA clause was intended to be a fair measure of the economic situation actually confronting the contractor, as required by law, and that it was not.
 
 [3]
 
 The government asserted that Beta assumed this risk when it accepted the contract, and on this basis the Claims Court granted summary judgment on the government’s motion. The decision on Count III is appealed pursuant to 28 U.S.C. § 1295(a)(3).
 

 Summary judgment is an available procedure when material facts are undisputed, or if, when disputed facts are resolved in favor of the non-movant, judgment in law is nevertheless required in favor of the movant.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986);
 
 United States v. Diebold, Inc.,
 
 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962);
 
 Cooper v. Ford Motor Co.,
 
 748 F.2d 677, 679 (Fed.Cir.1984) (“whether, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in favor of the non-movant, the moving party was entitled to judgment as a matter of law”).
 

 Relevant is the following additional sub-clause of section H-8:
 

 c. Adjustment shall be made to the contract award prices for Items 0001AA, 0003, 0004AA, 0005, 0006AA, 0007, 0008AA and 0009 to account for differences between the published U.S. Department of Labor, Bureau of Labor Statistics (BLS) indices for labor and materials and those forecasted values set forth in Table II below....
 

 and other sub-clauses illustrating the method of calculation of the economic price adjustment. Sub-clause (g)(1) states that the BLS index “Machinery and Equipment, Code 11” will be used.
 

 The Claims Court held that because Beta had objected unsuccessfully to the entire EPA clause during contract negotiations, and then accepted the clause as presented by the government, Beta had waived any right now to object to any part thereof, including this BLS index as the measure of the adjustment. The Claims Court held that selection of this particular BLS index was not a mutual mistake, and that Beta “assumed the economic risks associated with the use of such an Index since it could have refused to enter into the Army contract containing a BLS Index”.
 

 
 *1185
 
 Beta argues that its primary objection at the time was not to the use of this BLS index, but to the basic principle of level line pricing and the requirement that Beta forecast four years of economic change. Beta had proposed, and the Army had rejected, a different measure of labor and material costs, based on BLS producer price and wage indices, with the index for “aluminum mill shapes” weighted as 61% of the total. Beta asserts that it did not agree even in principle to a measure that would not accurately, or even approximately, reflect actual changes in its costs due to inflation/deflation.
 

 Beta does not now challenge the principle of using a statistical index. The error or mutual mistake, if any, lies in the specific index chosen, and whether Beta must accept the consequences of an inapt index.
 

 “[I]t has been a fundamental precept of common law that the intention of the parties to a contract control its interpretation.”
 
 Firestone Tire & Rubber Co. v. United States,
 
 444 F.2d 547, 551 (Ct.Cl.1971).
 
 See also Alvin, Ltd. v. U.S. Postal Service,
 
 816 F.2d 1562, 1565 (Fed.Cir.1987) (“[I]n the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties”) (quoting S. Williston, A Treatise on the Law of Contracts § 601 (3d Ed.1961)). Government procurement contracts are not insulated from this basic principle of contract law, which, as reflected in the DAR, includes modification to correct a mutual mistake:
 

 DAR 17-204.4 (1981): A contract may be amended or modified to correct or mitigate the effect of a mistake, including ... a mutual mistake as to a material fact.
 

 The government concedes, as it must, that the purpose of the EPA clause was to accommodate inflationary/deflationary changes in the costs of labor and materials. The Defense Acquisition Regulations so require:
 

 DAR 3-404.3(c)(3)c.5 (1981): An index should be structured to encompass a large sample of relevant items yet bear a logical relationship to the type of contract costs being measured. The basis of the index should not be so large and diverse that it is significantly affected by fluctuations not relevant to the contract performance, yet must be significantly broad so as to assure the minimal effect of any single company, including the anticipated contractors.
 

 The government states that the BLS index for “Machinery and Equipment, Code 11” is the requisite broad index, and that even if the cost of aluminum increased more than did this index, that does not make the index faulty. The government argues that absolute accuracy is not required; and that Beta knew or should have known that this index might not track the price of aluminum, the major construction material for this contract. The government asserts that Beta’s view as to what the government intended by this choice of index is “conclusory”, and that at best Beta can argue that there was unilateral mistake, its own, not grounds for reformation.
 

 Beta points to the legal requirement that the index must comply with DAR 3-404.-3(c)(3)c.5. If the index failed to achieve its purpose (and the government does not dispute that the index did not approximate the change in Beta’s materials costs), then on its face the DAR was violated. The government’s insistence during negotiations on use of Section H-8 in its entirety, and the contractor’s acquiescence, does not immunize the government from the consequences of failure of the EPA clause to comply with the law stated as in the DAR. “The [DAR] is law which governs the award and interpretation of contracts as fully as if it were made a part thereof.”
 
 Chris Berg, Inc. v. United States,
 
 426 F.2d 314, 317 (Ct.Cl.1970);
 
 see also Firestone,
 
 444 F.2d at 553. If the BLS index violated the DAR, the government can not, by law, benefit from it.
 
 Cf. United States Fidelity and Guaranty Co. v. United States,
 
 676 F.2d 622, 630, 230 Ct.Cl. 355 (1982) (“a proven violation of an applicable statute or regulation may be enough to show that [government] conduct was arbitrary and capricious”).
 

 The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the con
 
 *1186
 
 tractor. If the BLS index that was selected does not comply with DAR 3-404.-3(c)(3)c.5, even approximately, it is not controlling whether or not Beta or the government foresaw, or accepted the risk of failing to foresee, this defect in the index. In
 
 Polarad Electronics, Inc.,
 
 ACAB No. 1116, 2 ECR ¶ 134 (1971), on facts substantially identical to the present case, the Board held that inclusion of an “inappropriate and inadequate ... price index in the escalation clause” constituted mutual mistake of a material fact, requiring correction by substitution of a proper index.
 

 The government does not challenge that Beta did not intend to use an index that would effectively eliminate its principal construction material from fair weight in the inflation adjustment. And there is a legal presumption that the government did not intend to use an index that would violate the law as embodied in the DAR.
 

 If the contract is in violation of the DAR, and does not meet the requirement that an index be selected that approximately tracks the economic changes affecting this contract, then reformation is appropriate. The summary judgment on Count III is reversed, and the issue is remanded for determination of compliance with the DAR, and reformation if necessary to achieve such compliance.
 

 REVERSED AND REMANDED
 

 [1]
 

 .
 
 Beta Systems, Inc.
 
 v.
 
 United States,
 
 No. 738-85C (Cl.Ct. Oct. 9, 1986).
 

 [2]
 

 . The Claims Court was apparently persuaded that because the government operates on a year-to-year budget, sub-clause (p) could not apply to years and options for which funds had not yet been authorized. When the government enters into a multi-year procurement, as here, the negotiated terms apply to the full procurement whether or not funding has been approved for all years of the contract. This contract, like all governmental undertakings, contains the panoply of clauses by which the government can terminate the contract, or authorize the stepwise progression of its performance over its multi-year term. These assorted termination rights do not relieve either the government or the contractor of its obligations as set forth in a multi-year contract that is not terminated. Otherwise, rational multi-year and long-lead procurement would be impossible.
 
 See
 
 DAR 1-322.1(a) (1981).
 

 [3]
 

 . Beta asserts that the price of aluminum has increased by 40%, and that the cost of aluminum constitutes over half of the unit price of the articles.