BATACO INDUSTRIES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 90–3899C.

United States Court of Federal Claims.

Sept. 9, 1993.

Daniel A. Bellman, Columbus, OH, for plaintiff.

Lisa B. Donis, Washington, DC, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, David M. Cohen, Director, and Jeanne E. Davidson, Asst. Director, for defendant.  Carol N. Matheke, Defense Con-

struction Supply Center, Columbus, OH, of counsel.

## OPINION

ROBINSON, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for partial summary judgment. After initial briefing, oral argument and supplemental briefing, the court concludes that defendant's motion for summary judgment will be granted in its entirety and plaintiff's cross-motion will be denied. The court's reasoning follows.

### Background

This suit involves two claims for money damages by Bataco Industries, Inc. (plaintiff or Bataco), of Hollywood, Florida, stemming from defendant's alleged failure to comply with the Economic Price Adjustment Clauses (EPA clauses) in two fixed price contracts the Defense Logistics Agency, Defense Construction Supply Center (DCSC), in Columbus, Ohio, entered into with plaintiff for the manufacture and delivery of concertina barbed tape (CBT). CBT is a type of barrier wire utilized by the armed services for perimeter security. CBT consists of coils of spring steel line wire, fitted with cold-rolled steel barbed tape. The barbed tape is made by cutting a strip of cold-rolled steel to form a series of sharp barbs.

On March 20, 1985, DCSC awarded plaintiff the first contract, No. 700–85–C–0601 (the 0601 contract), in the amount of $12,-423,088.36, for the manufacture and delivery of 681,838 rolls of CBT. The Government subsequently exercised a contract option which modified the contract to require Bataco to manufacture and deliver a total of 765,663 rolls at a total contract price of $13,761,564.61. On December 24, 1985, DCSC awarded plaintiff the second contract for CBT, No. 700–86C–0983 (the 0983 contract), in the amount of $6,776,350, for a quantity of 332,500 rolls. Subsequent modifications increased the total contract price to $6,776,850.

Both of these contracts contained virtually identical EPA clauses (the difference in wording is immaterial). These clauses are designed to protect the parties against inflation or deflation during contract performance by providing for increases or decreases in the contract price based upon fluctuations in a specified index published in the Producer Price Index (PPI), a publication of the Bureau of Labor Statistics, U.S. Department of Labor (BLS). The PPI measures changes in prices "received by domestic producers of commodities in all stages of processing." The EPA clauses in these two contracts required that Bataco warrant that its contract price, as bid, did not contain any contingency allowances for inflation. Thus, as the specified PPI index either increased or decreased with economic changes, this contract provision would provide a degree of protection to both parties resulting from such fluctuations through contract price adjustments. Consequently, if a price adjustment request was made by Bataco within 180 days of final shipment of the product, as specified in these contracts, it would be able to obtain limited relief from the effects of inflation. However, these clauses provided that entitlement to a limited price increase would be waived unless the contracting officer received a written request from the contractor for the adjustment within 180 days after the final shipment of supplies.[1]

Both EPA clauses specified the applicable PPI code as "Code No. 10, Commodity Steel." However, there was no such PPI code as "Code No. 10, Commodity Steel" at

---

1. The pertinent language of the contracts is as follows:

    I46—*ECONOMIC PRICE ADJUSTMENT—DE-PARTMENT OF LABOR PRICE INDEX* (SEP 1982)—DCSC:
    (d) Price increases shall be subject to the following limitations:

    (1) Increases shall not exceed 10 percent of the contract unit price as of the contract date.
    (2) The contractor's entitlement to price increases shall be waived, unless the contractor's written request therefor is received by the contracting officer within 180 days after the date of final shipment of supplies under the contract.

the time of execution of the two contracts here involved. There was at that time and still is a PPI Code 10, "Metal and Metal Products," but neither party argues that that code is applicable to CBT. The parties, however, have never agreed upon which PPI code should have been inserted in the EPA clauses. Plaintiff contends that PPI Code 1088.0951 most accurately reflects any price fluctuations of CBT.[2] Defendant maintains that 1089.0989 is the appropriate PPI code.[3]

Contract clause I46(h) also appears in both contracts and provides:

> If the Bureau of Labor Statistics ... (1) discontinues an index identified herein, or (2) fails to publish an index identified herein for any month, or (3) changes the method of computation of an index identified herein during the effective period of the contract, the parties shall agree upon appropriate substitute or alternate index. Failure of the parties to agree on a substitute index or adjustment shall be a dispute within the meaning of the "Disputes" clause of this contract.

The final shipping date for the 0983 Contract was January 11, 1988, and May 4, 1988 for the 0601 Contract. Therefore, the 180 day periods for requesting a price adjustment expired July 9, 1988, and November 7, 1988, respectively. Plaintiff failed to contact the DCSC's contracting officer during that time period. Plaintiff avers that it initially attempted to obtain the appropriate PPI code from the BLS. By letter dated January 11, 1989, plaintiff requested that the DCSC contracting officer provide to it the appropriate PPI indices so that plaintiff could evaluate the "financial effect of the PPI ... and, if appropriate, submit the required invoicing to [DCSC] for the PPI adjustments."

The contracting officer responded to plaintiff's inquiry by letter dated October 30, 1989, in which he simply referred plaintiff back to the BLS. Subsequently, the BLS told plaintiff that PPI Code 1088.0951, "barbed and twisted steel wire," would be the appropriate code for CBT. Based upon this information, plaintiff submitted EPA claims to the contracting officer on February 7, 1990, using PPI Code 1088.0951 for its computations—$521,137.56 for the 0601 Contract and $34,418.52 for the 0983 Contract. In a decision dated April 24, 1990, the contracting officer denied plaintiff's requests as untimely based upon the contract limitation periods of 180 days. The contracting officer also determined that plaintiff's claims were premised upon the wrong PPI code. On June 15, 1990, plaintiff requested reconsideration of the contracting officer's decision. On September 14, 1990, the contracting officer issued a final decision, again denying plaintiff's claims as untimely.

Presently, the Government incorporates PPI Code 1089.0589, "other fabricated metal products" in contracts for CBT; that code was created in June, 1985, over two months after the award of the 601 Contract to plaintiff. The Government presently does not use PPI Code 1088.0951, advanced by plaintiff as the proper code, in any contracts for CBT because the BLS ceased publication of that code in July, 1991; however, PPI Code 1088.0951 was published during the contractual time periods here involved.

Plaintiff filed its complaint in this court on October 31, 1990, approximately eighteen months after final shipments under the contracts, seeking reformation of the contracts to include the PPI Code 1088.-0951 as the appropriate code.

### Contentions of the Parties

Defendant forcefully argues that Bataco's claims are time-barred under subsec-

---

**2.** PPI Code 1088.0951 was entitled "Barbed and Twisted Steel Wire." Although this code existed during the entire life of the contracts at issue, the BLS ceased publishing the code in July 1991.

**3.** PPI Code 1089.0989 is entitled "Other Fabricated Metal Products." Products being reported into Code 1089.0989 include: metal ladders, permanent magnets, metal aerosol valves, metals spools and reels, steel boxes, stamped metal wheels, metal memorial tablets and grave markers, and fabricated assemblies of railroad frogs and switches.

tion (d)(2) of these contracts because it failed to file its claims for adjustments within the applicable 180 day period specified in the two contracts which was agreed upon by Bataco. Further, defendant argues, the burden is upon the contractor in a fixed price contract, such as those here at issue, to request price increases during the specified periods after deliveries under these contracts. Therefore, defendant concludes, since plaintiff failed to submit a written request within 180 days after the date of final shipment of supplies under either contract, Bataco's entitlement to any such increases is forever waived or barred. Alternatively, defendant argues that if the court finds that plaintiff's non-compliance with subsection (d)(2) did not constitute a waiver of a right to seek a price adjustment, PPI Code 1089.0589, not Code 1088.-0951, more accurately reflects the price fluctuations of CBT. Therefore, defendant argues that any recovery by plaintiff should be limited by application of PPI Code 1089.0589.

In response, plaintiff contends that the 180 day provision in both contracts is only a notice provision which should not be strictly applied, particularly since plaintiff's delay in filing was due to a latent ambiguity in the EPA clause as drawn by the Government. Consequently, plaintiff, on equitable grounds as incident to this court's authority to render a money judgment under the Tucker Act and the Contract Disputes Act, seeks reformation of the contracts to reflect the proper PPI Code, which it contends is Code 1088.0951. In this regard, plaintiff contends that defendant has admitted that, assuming that paragraph (d)(2) is only a notice provision, reformation is appropriate under the rationale of *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed.Cir.1988).

Alternatively, plaintiff argues that subsections (h)(2) of the contracts support reformation of the contracts. Specifically, plaintiff maintains that because PPI "Code No. 10, Commodity Steel" simply did not

exist when these contracts were executed, the BLS, in effect, had "failed to publish" the code within the meaning of subsection (h)(2), thereby triggering the requirement for negotiation by the parties of a substitute index and, if no agreement is reached, handling of the matter under the disputes clause of the contract. Plaintiff contends, further, that the application of subsection (h)(2) in these circumstances is in consonance with the broad language and general remedial purpose of that subsection since the specified PPI code was erroneous. Thus, plaintiff urges that reformation is required either under subsection (h)(2) or the *Beta Systems* decision.

Next, plaintiff contends that even if the 180 day provision is a time-bar, the time should be equitably tolled until the proper PPI code can be established by this court since the Government was responsible for a latent ambiguity in the contracts and, after discovering its error in stating the PPI code, defendant withheld its superior knowledge of its error from plaintiff. Plaintiff reasons that it was impossible for it to determine whether it had a claim for any amount before it had an accurate code upon which to base its calculations. Thus, says plaintiff, only after receiving the proper code could it compute the proper amount due it and file a certified claim for a sum certain under the Contract Disputes Act.[4]

In reply, defendant attempts to distinguish *Beta Systems* because in that case the right to claim additional compensation was not conditioned, while in the present case there was an express condition—the time-bar provision—which cannot be read out of the contracts. In response to plaintiff's claims premised upon the Government's superior knowledge, defendant argues that it is entitled to the presumption that it has acted in good faith, and that plaintiff has not met its heavy burden of showing that defendant has breached an implied duty of good faith. Further, defendant contends that the presence of the wrong code in these contracts did not delay

---

**4.** Plaintiff contends that, if the court reforms the contracts and applies PPI Code 1088.0951, it need not submit a new claim to the contracting

officer because in plaintiff's certified claim letter of February 7, 1990, plaintiff stated that its claim was calculated with that code.

Bataco in submitting its request to the contracting officer seeking a price adjustment. Finally, defendant contends that subsection (d)(2) and not subsection (h) is controlling. Defendant reasons that subsection (h) presupposes the proper selection of a PPI code which is later discontinued or not published, circumstances not here present, and that if the court were to conclude that subsection (h) applies, it would nullify subsection (d)(2)'s 180 day requirement.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, facts that affect the outcome of the suit, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable finder of fact to return a verdict in favor of the non-movant. *Id.* Both plaintiff and defendant, as moving parties, have the burden of establishing that there are no genuine material issues in dispute and that, as movant, they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In opposing the other's motion, each party has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553. If the non-movant's evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Avia Group Int'l. Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir.1988).

In resolving cross-motions, the court may not weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510, 2513. Any evidence presented by the opponent is to be believed and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. With respect to any facts that may be considered as contested, each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences and intendments." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

That the parties, in their cross-motions, have separately alleged the absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition of the matter. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). Nor does the fact that inherently contradictory claims are being presented mean that if one is rejected, the other must be justified and therefore granted. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). Accordingly, the court must evaluate each party's motion on its own merits and drawing all reasonable inferences against the party whose motion is being considered. *Mingus*, 812 F.2d at 1391. In this case, the record submitted to the court confirms the parties' contentions that no material facts are in dispute. Consequently, the court finds that this matter may be disposed of on the parties' pending cross-motions.

## I.

■ Defendant's principal argument is that the 180 day provision is not a "notice provision" to alert the Government to potential claims, but a definite time-bar which limits the contractor's opportunity to request a price adjustment. According to defendant, this clause, which appears in both contracts, contemplates that the contracting officer must have received any equitable price adjustment claim within 180 days after the contractor's final shipment of CBT. Defendant observes that this limitation allows a full six months for the

contractor to review its records, research the PPI codes and submit a claim based upon a price adjustment to the contracting officer. Since plaintiff failed to submit adjustment claims for either contract until February 7, 1990, over a year after the deadlines for submission of these claims, defendant maintains that plaintiff's price adjustment claims are barred.

Plaintiff responds that the language of the 180 day clause evidences that it is only a notification provision, since it requires only a "written request." Plaintiff explains that since the Government used the phrase "written request" instead of "claim" in the contracts, it did not intend that Bataco file a formal claim within the 180 day period. Plaintiff argues that its January 11, 1989 letter served as adequate notice to the Government. Plaintiff admits that even this letter is past both deadlines involved (July and November, 1988); however, plaintiff maintains that under the *Hoel–Steffen* doctrine, courts liberally construe notice provisions where the contractor's failure to formally comply with the provision does not prejudice the Government. *See Hoel–Steffen Constr. Co. v. United States*, 197 Ct.Cl. 561, 573, 456 F.2d 760, 768 (1972).

Under the suspension of work clause before the United States Court of Claims in *Hoel–Steffen*, the contractor could recover from the Government for its increased costs if, within twenty days, it notified the contracting officer in writing of the act or failure to act involved.[5] *Id.* at 570, 456 F.2d at 766. The court observed that the purpose of the notice provision in ¶ (b)(i) was to require the contractor to alert the Government to the delay-causing conduct, allowing the Government to evaluate the desirability and cost of continuing the conduct complained about. *Id.* at 570–71, 456 F.2d at 766. The *Hoel–Steffen* court held that the clause should not be enforced "too illiberally or technically" since the Government had *actual* notice of the contractor's complaint. *Id.* at 573, 456 F.2d at 768.

Plaintiff suggests that the language of the suspension of work clause in *Hoel–Steffen* buttresses its contention that the clauses in Bataco's contracts are notice provisions, not claim provisions. Paragraph (b)(ii) of the clause in that case was a claim provision with which the plaintiff complied. *Id.* at 570, 456 F.2d at 766. Plaintiff emphasizes that ¶ (b)(ii) specifically used "claim" which plaintiff maintains is a term of art for claim provisions, whereas the notice provision in ¶ (b)(i) did not.

Similarly, plaintiff has cited *Interlog Corp.*, ASBCA No. 21212, 77–1 B.C.A. (CCH) ¶ 12,362, 1977 WL 2034 (Feb. 7, 1977), as an example of a notice provision being liberally construed. The relevant paragraphs of the price adjustment clause in that case provided:

b.  During the performance of the contract, the contractor shall notify the contracting officer in writing when there is an increase or decrease in material costs and direct labor costs for the contract supplies....

c.  The contractor's notice must be submitted within 30 days after any change

---

5. The suspension of work clause at issue in that case provided as follows:

(b) If, without the fault or negligence of the Contractor, the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract, or by his failure to act within the time specified in the contract (or if no time is specified, within a reasonable time), an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing ac-

cordingly.... *No claim under this clause shall be allowed (i) for any costs incurred more than twenty days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has issued), and (ii) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption but not later than the date of final settlement of the contract. Any dispute concerning a question of fact arising under this clause shall be subject to the Disputes clause.*
*Id.* 456 F.2d at 763 n. 2 (emphasis added).

in material direct labor costs and be accompanied by data.... *Id.* at 59,828–29. Plaintiff observes that the provisions in *Interlog* use "notice" instead of "claim." Plaintiff points out that the Armed Services Board of Contract Appeals (ASBCA or board) liberally construed the EPA clause to allow a contractor to obtain price adjustments which would have been lost had the board strictly applied the clause.

Plaintiff also discusses *Sky Top Plastics, Inc.*, GSBCA Nos. 7000, 7110, 7116, 91–1 B.C.A. (CCH) ¶ 23,350, 1990 WL 125968 (Aug. 7, 1990). In that case, the General Services Board of Contract Appeals (GSBCA or board) applied the *Hoel–Steffen* doctrine to a price adjustment clause in a contract for polyethylene plastic bags. *Id.* at 117,089. The price adjustment clause required the plaintiff "to submit a written request for a price adjustment." *Id.* at 117,089. The board ruled that:

> When the contracting officer had actual or imputed knowledge of the facts giving rise to the claim such that the Government was not prejudiced by appellant's failure to adhere strictly to the notice requirement specified in the contract, ... the requirement for formal notification will not serve to bar a claim.

*Id.* at 117,092.

Plaintiff also relies on a subsequent decision by the GSBCA, *Chemray Coatings Corps.*, GSBCA No. 10117, 91–1 B.C.A. (CCH) ¶ 23,356, 1990 WL 146376 (Sept. 28, 1990), to demonstrate that the provisions in Bataco's contracts are notice provisions. Plaintiff asserts that the board interpreted the following paragraph as a notice provision:

> (c) Increases may be requested after the first thirty (30) days of the contract period and prior to the last sixty (60) days of the contract period. The contractor shall submit a *written request* for price adjustment and such request

shall include the new price(s) and the basis for the determination. In the event of a decrease, the Government has the right to unilaterally adjust the contract price(s).

*Id.* at 117,127 (emphasis added).

Although the board applied the *Hoel–Steffen* doctrine, a careful reading of *Chemray* reveals that the sole issue before the board involved the timing of the plaintiff's price adjustment not the plaintiff's entitlement to the price adjustment. *See id.* at 117,129. Further, the board was interpreting ¶ (d) not ¶ (c).[6] Accordingly, the court finds that *Chemray* fails to add to plaintiff's argument.

The court is not persuaded by plaintiff's contention that "claim" is a necessary term of art for time-bar provisions, and since that word does not appear in (d)(2) of Bataco's contracts, that provision must be simply a notice provision. In fact, conversely, it may be argued that "notice" or "notify," also absent from the EPA clauses at issue, are terms of art essential to notice provisions; therefore, their absence means that the provisions in Bataco's contracts must be claim provisions. Further, the contract provision in *Interlog* contrasts sharply from those here at issue in that the former does not provide that a contractor's entitlement will be waived if the contractor fails to request price adjustments within a certain time period. *See Interlog*, 77–1 B.C.A. (CCH) at 59,828.

In opposition, defendant argues that the EPA clause in Bataco's contracts is more analogous to the termination for convenience clause in *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637 (Fed. Cir.1989). That clause provided that "the claim shall be submitted promptly but in no event later than one year from the effective date of termination." *Id.* at 638. The court in that case upheld the termination for convenience clause and denied relief to the contractor because the claim was sub-

---

**6.** Paragraph (d) provided in part, "[I]f the required conditions have been satisfied, a contract modification will be issued reflecting the price adjustments effective thirty (30) calendar days after receipt of the request from the contractor.

The adjusted price(s) shall apply to delivery/purchase orders issued to the Contractor after the effective date of this contract modification." *Chemray* at 117,127.

mitted five months after the one year time limitation had expired. The *Do–Well* case was recently followed by the Agricultural Board of Contract Appeals in *Malheur Lumber Co.,* AGBCA No. 87–398–3, 91–1 B.C.A. (CCH) ¶ 23,545, 1990 WL 198292 (Nov. 28, 1990) and by this court in *Stone Forest Industries, Inc. v. United States,* 26 Cl.Ct. 410 (1992).

In *Malheur,* the road construction contractor had 60 days after receiving an acceptance of the roadwork from the Forest Service to submit a claim. *Malheur Lumber Co.,* 91–1 B.C.A. (CCH) at 118,072. The AGBCA concluded that there was no unequivocal evidence of when the Forest Service actually notified the plaintiff of its acceptance. The Board noted that "[a] provision limiting the time in which to file a claim operates as a bar against claims and is an enforceable provision." *Id.* at 118,074.

This court reached a similar result in *Stone Forest Industries,* 26 Cl.Ct. at 414. The plaintiffs in that case entered into numerous contracts with the Forest Service to purchase timber from national forests. *Id.* at 412. The plaintiffs were required to submit any claims under the contracts to the contracting officer within 60 days of receiving written notification that the sale was closed. *Id.* Twenty-six claims were submitted challenging the pricing index used in the contract. *Id.* Twenty of the claims were filed after the 60–day period had expired. *Id.* The court, relying on *Do–Well,* held that the time limitation provision was fully enforceable by the Government and that the twenty untimely claims were time-barred. *Id.* at 414. The court applied the rule of *Do–Well* even though the plaintiffs argued that the Government was on notice of the plaintiffs' claims because other related claims were filed within the 60–day period. *Id.* at 415.

Neither party has cited to the court any case involving the exact same language that is at issue in Bataco's contracts. Nor has the court's research revealed any such legal precedent. Accordingly, the court cannot unequivocally rule that "written request" means "notice" or that "written request" means "claim." *See Rice v. United States,* 192 Ct. Cl. 903, 908, 428 F.2d 1311, 1314 (1970). (The context of a word and the intention of the parties are "more meaningful" than the dictionary definition of a word.) However, under general rules of contract interpretation which require that the court construe contract language so as to give consistent meaning to all of the terms of a contract, *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985), on balance, the court must accept defendant's interpretation of the clauses here at issue. Unlike the notice provisions in the cases cited by plaintiff, the clauses in Bataco's contracts did not contemplate notices of price adjustments and modifications of the contracts during the course of performance of the contracts, but only after that performance.

The court notes another difference between typical notice clauses and the EPA clauses here at issue. The Bataco contract clauses do not require the contractor to submit any *reasons* for its request for payment, whereas clauses which are undeniably notice clauses usually require some statement of reasons for giving the notice. *See, e.g., Chemray,* 91–1 B.C.A. (CCH) at 117,127; *Sky Top Plastics,* 91–1 B.C.A. (CCH) at 117,089; *Interlog,* 77–1 B.C.A. (CCH) at 59,829. Furthermore, ¶ (e) of the price adjustment clauses, which provides for price decreases, requires the contractor to "promptly *notify*" the contracting officer of changes in the economic indicator which will result in price decreases." (Emphasis added.) Logically, had defendant intended to impose a notification requirement only, it would have used the word "notice" in ¶ (d)(2) and not the word "request" in conjunction with the clearly restrictive word "waiver."

The court finds, after examining the language and purpose of the EPA clauses, the disputed clauses resemble more closely the time-bar in *Do–Well* than any of the previously mentioned notice clauses in the cases cited by plaintiff. This is the more logical interpretation of the words of the EPA clauses in plaintiff's two contracts when they are given their plain and ordinary

meaning.[7] *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965).

■ Further, the Government is entitled to have its contract rights and duties governed by the same contract principles applicable to contracts between private individuals. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *accord Reliance Ins. Co. v. United States,* 931 F.2d 863, 866–67 (Fed.Cir.1991). This is true whether or not the Government may have had a superior bargaining power in connection with the execution of these contracts. *See Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d at 641; *McCall v. United States Postal Service,* 839 F.2d 664, 667 (Fed.Cir.1988).

## II.

Plaintiff argues that even if the 180 day provision operates as a time limitation, its claim should not be barred because of the special facts of this case, i.e., the Government imposed delay and the Government's superior knowledge that Code 10 was not an appropriate PPI code to determine price increases. Specifically, plaintiff contends that defendant was aware in October, 1986 that Code 10 was not the proper code and that the *Michael Industries* litigation, involving a contract identical to Bataco's contracts, informed defendant that Code 10 was in fact not an appropriate code. However, the Government denied plaintiff's claim on the ground that Code 10 was appropriate and initially maintained in the *Michael Industries* litigation that Code 1088.0951 was not the most appropriate code.[8]

The court cannot ignore the fact that Bataco has advanced no valid excuse for not filing within the applicable 180 day period. Mr. Stanley Spitzer, Bataco's President, testified during his deposition that he knew from talking with the president of Michael Industries that Bataco's contracts possibly referenced an inaccurate PPI code because both companies had essentially the same contracts due to a split award for the acquisition of CBT. As well, Mr. Spitzer admitted that he was aware of the time limitation in the EPA clauses of these two contracts, but waited to file any request for adjustment because of the personal attention he was forced to give to a major plant clean-up then in progress due to an environmental problem at its worksite. In Mr. Spitzer's words, the filing of Bataco's requests became a "secondary thing" in his mind. Consequently, the 180 day time periods which the contracts allowed for submission of Bataco's requests, after publication of the final indices, did not prejudice Bataco and, in fact, did not cause Bataco's failure to file within those time periods. The fact that the Government delayed responding to Bataco's letter request for assistance from the contracting officer is immaterial because the time-bar had already effected a waiver of both of Bataco's potential claims. Even if the Government at that time may have had some knowledge respecting the proper code to be applied because of the *Michael Industries* claim then pending, Ba-

7. The clauses, in essence, allowed the contractor approximately 60 days to determine from the final published commodity index figures, which are available after four months from any month in issue, whether or not it had a claim for additional compensation under the PPI code. The defendant's brief points out that final figures for January were available in the May issue of the PPI Index. However, the apparent restrictiveness of this four month's delay is mitigated by the availability of "first release" or preliminary data in the next month's index. Consequently, a reasonably diligent contractor from examination of these preliminary data could receive some forewarning of an increase under the EPA clause and its consequent entitlement to legitimately claim added compensation. In short, under the facts presented, the court interprets ¶ (d)(2) to be a time-bar provision which did not place an undue burden upon Bataco.

8. Subsequently, the Government and Michael Industries settled their dispute upon payment of an unspecified amount. On the basis of that knowledge, this court, with the agreement of both parties, suspended this case to allow settlement discussions to proceed with a view toward possible settlement upon the same general terms and conditions that formed the basis for the *Michael Industries* settlement. Unfortunately, however, the parties were unable to reach a settlement making the issuance of this ruling upon the parties cross-motions necessary.

taco was not prejudiced by that fact and certainly was not betrayed into a "ruinous course of action" by defendant's silence.

■ The court next focuses on plaintiff's superior knowledge claim. In order to establish a valid claim of superior knowledge, a plaintiff must show that it attempted to perform the contract without vital information which affected the cost or duration of the contract; that the Government was aware that the plaintiff had no knowledge of the information; that any specification supplied misled the plaintiff, or did not give the plaintiff notice to inquire about the specification; and, the Government failed to provide the information. *Bauunternehmung v. United States*, 10 Cl.Ct. 672, 678 (1985), *aff'd*, 820 F.2d 1208 (Fed.Cir.1987). Bataco's claim of the Government's superior knowledge is based upon the assertion that the Government knew that the proper code was Code 1088.0951 and that it had a duty to inform Bataco of that fact. The undisputed facts show, however, that the Government has never agreed with plaintiff as to the proper code to be applied. It is also clear that the PPI codes are as readily available to plaintiff as to the Government. Consequently, the basic factual circumstances which must be present to support a superior knowledge claim are simply not present here. Therefore, the court also finds that plaintiff's statement of facts relating to defendant's alleged superior knowledge of the proper code and its effect upon this litigation, even if accepted as true for purposes of its cross-motion, is insufficient to show that defendant had superior knowledge.

■ Moreover, defendant correctly argues that Bataco did not need the exact code to file its requests for compensation. It needed the proper code to accurately compute the actual amounts due, but the EPA clause did not require that the requests specify the exact amounts due at the respective times that they were due to be submitted. In any event, had Bataco exercised due diligence before expiration of the 180 day period, it would have (or should have) discovered the now admitted error in the EPA clauses (the nonexistence of the

"Code 10—Commodity Steel" in the PPI) and, at the least, could have requested a reasonable extension of the 180 period to allow time to determine the properly applicable PPI code for this product and actually compute the exact amount sought.

Bataco's obligation under the contracts was to, if justified, request additional compensation within the agreed upon time frame. Clearly, it was only after Michael Industries disputed the "Code 10—Commodity Steel" provision that the Government was alerted to a potential error in the EPA clauses in the Bataco contracts. Under the agreed upon facts before the court, the Government had no duty to volunteer information as to what *might* be an error in the designated PPI code when the fact of an error had not as yet been established, much less agreed upon, with Michael Industries in connection with that company's pursuit of its claim. *See Stone Forest Indus., Inc.*, 26 Cl.Ct. at 415 (holding that the earlier filing of analogous claims by other companies does not place the Government on notice such that the time limitation provision would be inapplicable). Bataco did not attempt to file a claim under either contract until well after the time limitations set forth in the contracts. Nor in a broader context is there any evidence of an intent to delay Bataco from compliance with the EPA provision through its actions or inactions. Accordingly, the court holds that the Government was not responsible for Bataco's delay in filing its request for compensation within the 180 day periods applicable under the contracts, and that defendant has acted with due diligence under the circumstances. The court finds that plaintiff's contentions regarding undue delay attributable to defendant's actions without sufficient support on this record and, therefore, without merit.

### III.

Plaintiff next, on equitable grounds as incident to this court's authority to render a money judgment under the Tucker Act and the Contract Disputes Act, seeks reformation of the contracts to reflect the proper PPI code, which it contends is Code

1088.0951. Plaintiff contends that reformation is mandated by *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed.Cir. 1988).

Defendant states that because Bataco failed to comply with the time-bar provision in clause I46(d)(2), an express condition, Bataco never had a right to a price adjustment under the contracts. Defendant argues that plaintiff was only required to submit, within 180 days, a "written request," perhaps a letter, requesting an adjustment, without anything more, in order to comply with the time-bar provision. In other words, defendant is maintaining that plaintiff's request, if timely, need not have advanced a particular code provision and, therein, demand a sum certain. In fact, according to defendant, had Bataco merely submitted a timely letter request, the Government would have been obligated, pursuant to § I46(f) of the contracts, to perform the calculations and issue the price adjustment. In defendant's view it logically follows that its admitted use of the wrong code in these contracts is immaterial to the application of the 180 day time-bar provision.

Defendant similarly argues that *Beta Systems*, is distinguishable factually because in the case at bar plaintiff, though its inaction, failed to trigger the right to claim additional compensation; whereas, in *Beta Systems*, the plaintiff's entitlement to the price adjustment was not at issue.

In *Beta Systems*, the plaintiff and the Army Troop Support and Aviation Material Readiness Command entered into a fixed-price contract with an economic price adjustment. *Beta Sys.*, 838 F.2d at 1180. The EPA clause specified that the price would be adjusted using BLS index "Machinery and Equipment, Code 11." *Id.* at 1184. This court determined that reformation of the contract was inappropriate because no mutual mistake occurred. *Id.* The court reasoned that the plaintiff could have refused to enter into the contract with the Army. *Id.* The United States Court of Appeals for the Federal Circuit reversed this court's decision and remanded the case, holding that, if this court determined

that the index was defective, the contract would violate the Defense Acquisition Regulations (DAR) and reformation of the contract by this court would be appropriate. *Id.* at 1186.

The relevant procurement regulations in effect at the time defendant entered in the contracts at issue were identical to those discussed in *Beta Systems:*

> An index should be structured to encompass a large sample of relevant items yet bear a logical relationship to the type of contract costs being measured. The basis of the index should not be so large and diverse that it is significantly affected by fluctuations not relevant to the contract performance, yet must be significantly broad so as to assure the minimal effect of any single company, including the anticipated contractors.

Defense Federal Acquisition Regulation Supplement (DFARS) 216.203–4(d)(3)(v); 48 C.F.R. § 216.203–4(d)(3)(v) (1988); *see Beta Sys.*, 838 F.2d at 1185. Thus, plaintiff contends that under the rationale of *Beta Systems*, this court should reform plaintiff's contracts to reflect a more appropriate BLS index.

Unfortunately for plaintiff, the similarities between this case and *Beta Systems* are outweighed by one substantial difference. Even if the court found that a mutual mistake had occurred and ordered reformation of the contract to reflect another code, plaintiff's failure to comply with the time-bar provision, which the court has interpreted to be an express condition for plaintiff to garner any price adjustment, would nonetheless defeat plaintiff's recovery. In other words, reformation is inappropriate to relieve plaintiff in this case, because the error in the identification of the index failed to have a material effect on the bargain. *See* Restatement (Second) of Contracts §§ 151–152, 155 (1981) (elements that must be present for contract reformation in the case of mutual mistake). To hold otherwise would totally defeat the purpose of the waiver language in the contracts. Thus, the court must deny plaintiff's request for reformation to avoid violating basic principles of contract construc-

tion. *See Tombigbee Constructors v. United States*, 190 Ct.Cl. 615, 630, 420 F.2d 1037, 1045 (1970); *Hol–Gar Mfg. Corp.*, 169 Ct.Cl. at 395–96, 351 F.2d at 979.

## IV.

Plaintiff's final contention is that clause I46(h)(2) is controlling in this case because the BLS never published a "Code 10, Commodity Steel" as a PPI code. This contention was invited by the court and at the court's request supplemental briefs were filed which related to the possible applicability of this clause in the contracts. However, upon careful analysis, the court must agree with the defendant's contention that this clause is to be interpreted in accordance with its plain meaning as well as consistency with the BLS's procedures for code publication. *Thanet Corp.*, 219 Ct.Cl. at 82, 591 F.2d at 633; *Hol–Gar Mfg. Corp.*, 169 Ct.Cl. at 390, 351 F.2d at 976. The clause, read in accordance with basic principles of contract interpretation so as to give meaning to all provisions of the contract, *Thanet Corp.*, 219 Ct.Cl. at 82, 591 F.2d at 633; *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975), contemplated a very specific set of circumstances—those occasions when, during the life of the contract, BLS elected to discontinue or failed to publish for various reasons a particular code that had actually been selected and agreed upon by the parties. That simply did not happen in this case. The court rejects plaintiff's contention that the language used in describing the contingencies evinced an objective intent to have the subparagraph apply whenever the PPI code cited in a contract fails for whatever reason. In fact, to so read clause I46(h)(2) would effectively nullify the time-bar intended by clause I46(d)(2). Courts should avoid interpretations that would render portions of a contract void or meaningless. *Tombigbee Constructors*, 190 Ct.Cl. at 630, 420 F.2d at 1045; *Hol–Gar Mfg. Corp.*, 169 Ct.Cl. at 395–96, 351 F.2d at 979. Consequently, the court finds that clause I46(h)(2) notwithstanding, the presence of clause I46(d) in the contracts, is determinative and established a time-bar to plaintiff's request for an adjustment with which plaintiff, unfortunately, failed to comply.

## CONCLUSION

It is apparent that defendant simply made a mistake in specifying "Code 10, Commodity Steel" as the applicable PPI code in the EPA clause. There was and is no such code. However, plaintiff's inaction, in not submitting a written request for an adjustment within the stated time period or at least requesting an extension of the time period, cannot be attributed to the presence of an erroneous code in the contracts. In short, plaintiff was not detrimentally misled by the error. Further, even if the court found that a mutual mistake had occurred and ordered reformation of the contract to reflect another code, plaintiff's failure to comply with the time-bar provision, which the court has interpreted to be an express condition for plaintiff to garner any price adjustment, would nonetheless defeat plaintiff's recovery. To hold otherwise would totally defeat the purpose of the waiver language in the contracts. The court cannot "create a fiction," and thereafter allow Bataco an additional 180 days from the date of reformation to request adjustments based upon its contention that a particular code should be applied. Moreover, the evidence is insufficient to find governmental bad faith. Accordingly, this court declines to equitably toll the time-bar in subsection (d)(2) until the court can determine the appropriate PPI code. Finally, the court concludes that subsection (d)(2), not subsection (h) in these contracts, is controlling. To rule otherwise would effectively nullify the time-bar provision in subsection (d)(2).

For the above reasons, the court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for partial summary judgment.

No costs.